SHERIDAN ROAD BAPTIST CHURCH v DEPARTMENT OF
EDUCATION

Docket No. 73665. Argued November 13, 1985 (Calendar No. 14).
    Decided November 24, 1986. Rehearing denied 427 Mich 1202.
    The Sheridan Road Baptist Church and the First Baptist Church
        of Bridgeport and their pastors, parents of children attending
        schools run by the churches, and certain members of the
        faculties of the schools brought an action in the Ingham Circuit
        Court against the Department of Education, seeking a declara-
        tion that the requirement of the nonpublic schools statute that
        teachers in nonpublic schools be certified by the state is uncon-
        stitutional. The court, Ray C. Hotchkiss, J., found the certifica-
        tion requirements unconstitutional as interfering with the
        plaintiffs' rights to the free exercise of religion and creating
        excessive government entanglement with religion. The Court of
        Appeals, M. J. KELLY, P.J., and HOOD and SHEPHERD, JJ., re-
        versed, holding that the requirements violated neither the Free
        Exercise nor the Establishment Clauses of the First Amend-
        ment of the United States Constitution (Docket No. 69050). The
        plaintiffs appeal.
    The judgment of the Court of Appeals is affirmed by an
equally divided Court.
    Chief Justice WILLIAMS would hold that the interest of the
state in ensuring that all teachers meet certain minimum
requirements outweighs the slight burden placed on the plain-
tiffs' rights to the free exercise of religion by the certification
requirements. As applied, the requirements are not discrimina-
tory and do not require adherence to a particular religious
outlook. They are not violative of the Establishment Clause;
nor do they lead to excessive entanglement of church and state.
    1. To teach in a school in Michigan, a teacher must be
certified by the State Board of Education as meeting certain
minimum requirements promulgated by the board. Objections
to state regulations on the ground that they violate a person's
right to the free exercise of religion are analyzed by determin-
ing whether the plaintiff's claims are rooted in religious beliefs;
whether the regulation infringes upon the plaintiff's right; if so,
whether any incidental burden on the right is justified by a
compelling state interest in the regulation; and whether a less

obtrusive form of regulation is available to the state. Where an objection to a regulation is raised on the ground that it is violative of the Establishment Clause, the state must show that it has a secular legislative purpose for the requirement, that the regulation's principal, primary effect neither advances nor inhibits religion, and that it does not foster an excessive government entanglement with religion.

2. In this case, while the plaintiffs' objections are premised on their religious beliefs, any minimal infringement on their right of free exercise of religion is outweighed by the compelling interest of the state in furthering the education of its citizens through competent teachers by requiring teacher certification. As applied, the certification requirements do not enable the board to discriminate on the basis of religious belief. No less intrusive method of satisfying the state's interest was shown. The regulations at issue have a secular purpose and do not have the primary effect of advancing or inhibiting religion. In addition, it is clear that the certification requirements do not impermissibly entangle government with religion. The state merely enforces minimum standards with regard to persons who wish to teach. Once a teacher is certified, there is no continuing relationship between the government and the churches and schools.

Justice BOYLE, joined by Justice BRICKLEY, concurring with Chief Justice WILLIAMS, would hold that at issue primarily in this case is whether the teacher certification requirement imposed by the state impinges upon the plaintiffs' First Amendment right of freedom of religion. In evaluating free exercise claims, it must be determined whether the government has shown that an unusually important interest is at stake and that the granting of an exemption to the challenged requirement would do substantial harm to the interest. Application of the standard, at a minimum, must involve a balancing process, requiring great circumspection in weighing the state's legitimate social interest and the request for religious exemption.

1. The Freedom of Religion Clause of the First Amendment embraces the freedom to believe and the freedom to act. The freedom to believe is absolute, but the freedom to act is subject to regulation. Where the state regulates conduct by enacting a neutral law within its power for the purpose and effect of furthering its secular goals, the statute may be valid despite an indirect burden on religious conduct unless the purpose may be achieved through less burdensome means.

2. The standard for determining free exercise claims involves a balancing that countenances shifting burdens of persuasion

in proportion to the proofs admitted at trial. A mathematically certain formula cannot be created which will account for the internal evaluation of each factor and its relative weight with respect to each other factor. The essential judicial task is to evaluate the asserted conflicts between private rights and public interests to ensure that neither is compromised or destroyed.

3. In this case, the teacher certification requirements constitute, at most, an indirect and minimal burden on the plaintiffs' free exercise rights, and the interest of the state is of such a high order as to override the interest for which protection is claimed. Alone, the regulation compels the plaintiffs neither to refrain from religiously motivated conduct nor to engage in conduct they find objectionable. The requirements represent a compelling state interest and a state regulation narrowly drawn to achieve the broader goal of quality education. The alternative offered by the plaintiffs does not fulfill the prophylactic goal of the state requirement to prevent children from being exposed to unqualified teachers.

Justice RILEY, joined by Justices LEVIN and CAVANAGH, would hold that the plaintiffs' religious practice with regard to employment of teachers is protected by the First Amendment, and the regulation as applied is constitutionally suspect. The trial court found that the plaintiffs' refusal to comply with the certification requirement is based upon sincerely held religious beliefs and that the requirement affirmatively interferes with the free exercise of those beliefs. The crucial question is whether the state established that enforcement of the requirement is essential to the fulfillment of a compelling governmental interest. It was incumbent upon the state to show that exempting the plaintiffs would unduly impair its interest in compulsory education and that enforcing the requirement is the least intrusive means by which to accomplish the objective. The state failed to meet its burden. The record firmly establishes that accommodating the plaintiffs' religious practice with regard to the hiring of teachers will have no adverse effect on the state's interest in compulsory education, and that less intrusive means are available by which the state could adequately supervise and ensure the future fulfillment of the legitimate public interests underlying the compulsory education law. Establishing that the teacher certification regulation is rationally related to the state's interest is insufficient to demonstrate the necessity of overriding the plaintiffs' First Amendment rights. The teacher certification employment regulation alone, however, does not violate the Establishment Clause.

Justice ARCHER took no part in the decision of this case.

132 Mich App 1; 348 NW2d 263 (1984) affirmed by equal division.

*Ball & Skelly* (by *William Bentley Ball, Philip J. Murren,* and *Sandra E. Wise*) and *Michael E. Thomas* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young* and *Paul J. Zimmer,* Assistant Attorneys General, for the defendants.

Amici Curiae:

*Steven F. McDowell,* General Counsel, and *Lawson, Marcus & Portko* (by *Jeffrey R. Portko*) for Catholic League for Religious and Civil Rights.

*Foster, Swift, Collins & Coey, P.C.* (by *James A. White* and *William K. Fahey*), for Michigan Education Association.

*Miller, Cohen, Martens & Ice, P.C.* (by *Mark H. Cousens* and *Glenda L. Pittman*), for Michigan Federation of Teachers, AFL-CIO.

WILLIAMS, C.J. This case involves primarily a free exercise of religion challenge based on the First, Ninth, and Fourteenth Amendments of the United States Constitution and art 1, § 4, and art 8, § 1, of the Michigan Constitution[1] to the state

---

[1] United States constitutional provisions:

    I. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .

    IX. The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

    XIV. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State

statute requiring teachers in nonpublic schools to be certified by the state. The lower court also found that the regulations resulted in an Establishment Clause violation.

Specifically, the free exercise challenge is in two parts. The first part is phrased as follows in plaintiffs' reply brief:

> To repeat: the Churches' point is not that a certified teacher may not teach in the Churches' schools' [sic]; it is that restricting the freedom of churches to engaging *only* government-certified teachers in its school ministry is abhorrent to their Scriptural beliefs. It is not for the State to play theologian in this matter. [Emphasis in original.]

The second part involves objections to the teacher certification rules. The plaintiffs' reply brief states:

shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Michigan constitutional provisions:

> Every person shall be at liberty to worship God according to the dictates of his own conscience. No person shall be compelled to attend, or, against his consent, to contribute to the erection or support of any place of religious worship, or to pay tithes, taxes or other rates for the support of any minister of the gospel or teacher of religion. No money shall be appropriated or drawn from the treasury for the benefit of any religious sect or society, theological or religious seminary; nor shall property belonging to the state be appropriated for any such purpose. The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious beliefs. [Const 1963, art 1, § 4.]

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. [Const 1963, art 8, § 1.]

> [T]he certification rules . . . intrude upon or threaten the operation of the church-schools in their selection of their teachers . . . . [T]he rules clearly evidence reservation of the ultimate State subjective control over important aspects of the making of a teacher in areas portending deep philosophical and religious differences between the plaintiff church-schools and prevailing secular philosophies concerning education matters. See, e.g. Roth testimony *supra* re "skills essential to . . . inquiry in modern society."[2]

Using the balancing analysis developed by the United States Supreme Court in *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972), and *Sherbert v Verner,* 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963), we find that the state's interest in ensuring that *all* teachers have met certain minimum requirements outweighs the slight burden the regulatory scheme poses to plaintiffs' free exercise rights. As applied, we find that the certification requirements are not discriminatory and do not require plaintiffs to adhere to any particular religious outlook. We also find that there is no Establishment Clause violation as the regulations do not lead to excessive entanglement between church and state.

We decline to reach the other issues initially raised by the plaintiffs as it appears they are no

---

[2] Another issue raised in the briefs is the applicability of the emergency teacher permit provision. Defendants suggest that if religious schools were unable to find certified teachers who also met their religious qualifications, 1979 AC, R 390.1145 would allow emergency permits to be issued. Plaintiffs respond by noting that the regulation gives the *public* school authorities the ability to recommend that such permits be issued. They express some doubt about whether these officials would define emergency so as to include situations in which state certified and religiously qualified applicants were unavailable.

Because there is no evidence in the record that there is a shortage of certified teachers deemed religiously qualified by the plaintiffs or that the plaintiffs have been unable to fill their teaching positions, we offer no opinion as to the applicability of this provision in those circumstances.

longer in controversy. Plaintiffs, both at oral argument and in their brief, and defendants at oral argument, indicated that there was agreement between the church and the state on the other points.[3]

## I. FACTS

In September, 1979, the Department of Education, acting under the authority of the state's nonpublic school statute, 1921 PA 302, MCL 388.551 et seq.; MSA 15.1921 et seq.,[4] sought to

---

[3] Both state and church herein are agreed that, as the State interprets the Michigan statutes, no constitutional issue with respect to curriculum, licensing, or the reporting of enrollment or courses of study is presented.

[4]     PRIVATE, DENOMINATIONAL, AND PAROCHIAL SCHOOLS
Act 302, 1921, p 560; eff August 18.

AN ACT to provide for the supervision of private, denominational and parochial schools; to provide the manner of securing funds in payment of the expense of such supervision; to provide the qualifications of the teachers in such schools; and to provide for the endorsement of the provisions hereof.

*The People of the State of Michigan enact:*

Sec. 1. The superintendent of public instruction is hereby given supervision of all the private, denominational and parochial schools of this state in such matters and manner as is hereinafter provided. He shall employ such assistants and employes as may be necessary to comply with the provisions hereof and fix the compensation thereof; the number of assistants and employes and the compensation payable thereto being subject to the approval of the state administrative board. Such salaries and expenses shall be paid by the treasurer of the state of Michigan upon the warrant of the auditor general from the fund as herein designated, at such time and in such manner as other state officers and employes are paid. The superintendent of public instruction shall have the authority to remove any appointee under this act at any time that he may deem such removal advisable. It is the intent of this act that the sanitary conditions of such schools, the courses of study therein, and the qualifications of the teachers thereof shall be

of the same standard as provided by the general school laws of the state. [MCL 388.551; MSA 15.1921.]

Sec. 2. A private, denominational or parochial school within the meaning of this act shall be any school other than a public school giving instruction to children below the age of 16 years, in the first 8 grades as provided for the public schools of the state, such school not being under the exclusive supervision and control of the officials having charge of the public schools of the state. [MCL 388.552; MSA 15.1922.]

Sec. 3. No person shall teach or give instruction in any of the regular or elementary grade studies in any private, denominational or parochial school within this state who does not hold a certificate such as would qualify him or her to teach in like grades of the public schools of the state: Provided, however, That any person who shall have taught in any· elementary school or schools of the standard specified in this act for a period of 10 years or more preceding the passage of this act, shall, upon filing proof of service with the superintendent of public instruction, be entitled to a certificate by said superintendent of public instruction in such form as he shall prescribe, to teach in any of the said schools within the state: Provided further, That teaching in such schools shall be equivalent to teaching in the public schools for all purposes in obtaining a certificate: Provided further, That the teachers affected by this act may take any examination as now provided by law and that the superintendent of public instruction may direct such other examinations at such time and place as he may see fit. In all such examinations 2 sets of questions shall be prepared in subjects ordinarily written on Saturday, 1 of which sets shall be available for use on Wednesday by applicants who observe Saturday as their Sabbath; Provided further, That any certificate issued under or by virtue of this act shall be valid in any county in this state for the purpose of teaching in the schools operated under this act; Provided further, That any person holding a certificate issued by the authorities of any recognized or accredited normal school, college or university of this or other state shall be entitled to certification as now provided by law: Provided, however, That teachers employed in such private, denominational or parochial schools when this act takes effect shall have until September first, 1925, to obtain a legal certificate as herein provided. [MCL 388.553; MSA 15.1923.]

Sec. 4. In event of any violation of this act the superintendent of public instruction shall serve the person, persons, corporation, association or other agencies who operate, maintain and conduct a private, denominational or parochial school within the meaning of this act with a notice, time and place of hearing, such hearing to take place within 15 days after the date of said notice and at a place located in or conveniently near the county where such violation took place, accompanied by a copy of the complaint stating the substance of said violation: Provided, That no person shall be called to attend any such hearing on any day observed by him as the Sabbath.

obtain information about student enrollment and teacher qualifications from two church schools. The schools refused to comply with the requests,

If at such hearing the superintendent of public instruction shall find that the violation complained of has been established he shall then serve said person, persons, corporation, association or other agencies with an order to comply with the requirements of this act found to have been violated within a reasonable time not to exceed 60 days from the date of such order: Provided, That in the event that such order refers to sanitary conditions that the said person, persons, corporation, association or other agencies shall have 6 months in which to remedy the defect. If the order of the superintendent of public instruction as specified in said notice shall not have been obeyed within the time specified herein said superintendent of public instruction may close said school and prohibit the said person, persons, corporation, association or other agencies operating or maintaining such private, denominational or parochial school from maintaining said school or from exercising any of the functions hereunder until said order of the superintendent of public instruction has been complied with. The children attending a private, denominational or parochial school refusing to comply with the requirements hereof after proceedings herein set forth shall be compelled to attend the public schools or approved private, denominational or parochial school under the provisions of the compulsory education act, the same being Act. No. 200 of the Public Acts of 1905, as amended. And it shall be the duty of the person or persons having charge of the enforcement of the said compulsory education act, upon notice from the superintendent of public instruction that said private, denominational or parochial school has not complied with the provisions hereof, to compel the attendance of the children of said school or schools at the public schools or approved private, denominational or parochial school. [MCL 388.554; MSA 15.1924.]

Sec. 5. The superintendent of public instruction by himself, his assistants, or any duly authorized agent, shall have authority at any time to investigate and examine into the conditions of any school operating under this act as to the matters hereinbefore set forth and it shall be the duty of such school to admit such superintendent, his assistants or authorized agents and to submit for examination its sanitary condition, the records of enrollment of pupils, its courses of studies as set forth in section 1 of this act and the qualifications of its teachers. Any refusal to comply with provisions herein on the part of such school or teacher shall be considered sufficient cause to suspend the operation of said school after proceedings taken as stated in section 4 of this act.

and, as a result, the state scheduled an administrative hearing to determine whether the schools were in violation of the statute.

On December 6, 1980, the schools, the church pastors, members of the schools' faculties, and parents of children enrolled in the schools filed a declaratory action in the Ingham Circuit Court, alleging that the statute which the state sought to enforce was unconstitutional on the basis of the First, Ninth, and Fourteenth Amendments of the United States Constitution, and art 1, § 4, and art 8, § 1, of the Michigan Constitution. Plaintiffs' request for a restraining order was granted, but subsequently vacated, after the state agreed to take no further action until the case was decided. On February 12, 1981, the defendants filed a counterclaim requesting that the court declare the nonpublic school statute constitutional on its face and as applied to the plaintiffs.

A six-day bench trial was held in April before Judge Ray C. Hotchkiss. At trial, it was established that Sheridan Road Baptist Church operates the Sheridan Road Christian School, and that First Baptist Church of Bridgeport operates the Bridgeport Baptist Academy. Both schools offer a kindergarten through grade twelve program. The plaintiffs were identified as the church schools, the pastors of the churches, and certain teachers at the schools and parents of students attending the schools.

In an opinion dated December 29, 1982, the trial court found that § 3 of 1921 PA 302, requiring teacher certification, was unconstitutional because it violated plaintiffs' free exercise rights and created excessive government entanglement with religion.[5]

---

[5] The court also found § 1 of the act, requiring that "the courses of

Defendants appealed this decision to the Court of Appeals which reversed the circuit court, holding that the certification requirements violated neither the Free Exercise nor the Establishment Clauses of the First Amendment.[6] *Sheridan Road Baptist Church v Dep't of Education,* 132 Mich App 1; 348 NW2d 263 (1984).

Plaintiffs' application for leave to appeal to this Court originally was denied, 419 Mich 916 (1984), but, after reconsideration, leave was granted on April 5, 1985, 422 Mich 857 (1985).

## II. FREE EXERCISE OBJECTION TO CERTIFICATION

### A. STATE SYSTEM OF REGULATION

The Legislature has determined that teachers in *all* schools in the state must be certified. MCL 388.551; MSA 15.1921 and MCL 388.553; MSA 15.1923, respectively, provide in relevant parts:

> It is the intent of this act that the sanitary conditions of such schools, the courses of study therein, and the qualifications of the teachers thereof shall be of the same standard as provided by the general school laws of the state.
> No person shall teach or give instruction . . . in

study [in private schools] and the qualifications of the teachers thereof shall be of the same standard as provided by the general school laws of the state" was unconstitutional because of excessive government involvement with religion. Section 5 of the act, providing for examination of school records to determine compliance with the act, was upheld, with the restriction that information obtained be used only for statistical or comparative purposes. Section 4 of the act, providing for hearings and sanctions for violations of the act, was upheld.

[6] The court also found that the curriculum requirements were constitutional and that the trial court had erred in limiting the purposes for which statistical data from nonpublic schools could be used. Plaintiffs' contentions that the regulatory scheme was vague or that it created a danger of future abuses were not accepted by the court.

any private, denominational or parochial school within this state who does not hold a certificate such as would qualify him or her to teach in like grades of the public schools of the state . . . .

The regulations governing teacher qualifications are promulgated by the State Board of Education and contained in the Teacher Certification Code, 1979 AC, R 390.1101 *et seq.,* 1981 AACS, R 390.1101 *et seq.* In order to obtain a provisional teaching certificate,[7] an applicant must demonstrate the following:

1) completion of at least forty semester hours in a program of general or liberal education and demonstration of an acquaintance with the substance, concepts, and methods of the principal areas of human knowledge and skills essential to communication and inquiry in modern society;

2) completion of a program providing for depth in the substantive field to be taught;

3) completion of twenty semester hours in education courses (including at least six hours of directed teaching);

4) completion of a major of at least thirty semester hours and a minor of twenty semester hours (or for an elementary certificate completion of *either* a major of at least thirty semester hours *or* three minors of twenty semester hours each);

[7] Upon receiving a degree from an undergraduate institution, an applicant is entitled to only a *provisional* certificate. To acquire a continuing certificate, a teacher must complete three years of successful teaching and complete 18 post-graduate semester hours or obtain a master's degree. 1981 AACS, R 390.1132.

5)   a bachelor's degree obtained from an approved
     Michigan college or university or an accept-
     able certificate issued by another state.

Under these regulations, the State Board of Educa-
tion has issued thousands of provisional certifi-
cates to out-of-state college graduates, including
graduates of Catholic and fundamentalist Chris-
tian schools.

### B.   TEST FOR ANALYZING FREE EXERCISE OBJECTIONS TO STATE REGULATIONS

The United States Supreme Court has developed
a method of analyzing free exercise objections to
state statutes. The following three quotations will
serve as a basis for our development of a four-part
test for this analysis.

The first quotation is from *Wisconsin v Yoder,*
406 US 215, and reads as follows:

   [T]o have the protection of the Religious Clauses,
   the claims must be rooted in religious belief.

The second quotation is from *Sherbert v Verner,*
374 US 403, and reads as follows:

   If therefore, the decision of the South Carolina
   Supreme Court is to withstand appellant's consti-
   tutional challenge, it must be either because her
   disqualification as a beneficiary [of unemployment
   compensation] represents no infringement by the
   State of her constitutional rights of free exercise,
   or because any incidental burden on the free
   exercise of appellant's religion may be justified by
   a "compelling state interest in the regulation of a
   subject within the State's constitutional power to
   regulate . . . ." *NAACP v Button,* 371 US 415,
   438 [83 S Ct 328; 9 L Ed 2d 405 (1963)].

The third quotation is also from *Sherbert,* 374
US 407, and reads as follows:

> [I]t would plainly be incumbent upon the appel-
> lees to demonstrate that no alternative forms of
> regulation would combat such abuses without in-
> fringing First Amendment rights.

From these three quotations we derive the fol-
lowing four rules with which to analyze the in-
stant case:

1.  Plaintiffs' "claims must be rooted in religious
    belief." *Yoder.*

2.  If the regulation poses "no infringement by the
    State of [plaintiffs'] constitutional right[ ] of
    free exercise," *Sherbert,* the regulations will be
    upheld. If the regulation is upheld for this
    reason, rules three and four are inapplicable.

3.  "[A]ny incidental burden on the free exercise
    of [plaintiffs'] religion may be justified by a
    'compelling state interest in the regulation of a
    subject within the State's constitutional power
    to regulate . . . .' " *Sherbert.*

4.  No less obtrusive form of regulation is avail-
    able to the state. *Sherbert.*

### 1.  THE RELIGIOUS NATURE OF THE CLAIMS

There is no dispute as to the religious nature of
the plaintiffs' objections to the certification re-
quirement. The trial court found that

> [p]laintiffs are members of the Fundamentalist
> Christian movement . . . . The fundamentalist
> movement believes the church to be not only a

place of worship but [a] place for instruction of the young. An outgrowth of this belief is the belief that the school is an extension of the church or a ministry of the church . . . . As fundamentalists, plaintiffs object to state regulation of their schools which they consider a mission ordained by God. They further object to the certification of their teachers, believing that the course of study required to obtain a certificate teaches a humanistic rather than a religious approach to education.

Defendants note that they agree that plaintiffs' objections to the statute are premised on their religious beliefs.

### 2. *BURDEN ON FREE EXERCISE RIGHTS*

The churches advance two ways in which the regulations burden their religious interests. The primary objection is that "no one may carry out a teaching ministry in a church-school without a government permit to do so." We accept plaintiffs' claim that such licensing has an effect on their free exercise rights, and we therefore must determine whether this burden is outweighed by a compelling state interest. Second, they object to the discretion given to the state to determine whether an applicant is qualified to receive a provisional teaching certificate. The regulations require an applicant to demonstrate "an acquaintance with the substance, concepts, and methods of the principal areas of human knowledge, and skills essential to communication and inquiry in modern society." 1979 AC, R 390.1122. Other portions of these regulations enable the state to implement this with virtually unlimited discretion because it is the board which determines the acceptability of particular courses from out-of-state institutions, the acceptability of out-of-state candidates with certificates from their states and the acceptability of the educational institutions themselves in Mich-

igan.[8] We acknowledge that the regulation *could* be applied in a manner which discriminates against those taught at religious colleges or universities.

The other plaintiffs also testified about the burden certification posed to them. A teacher at the Bridgeport Baptist Academy testified at trial that her rights would be infringed upon if she were forced to comply with the state certification requirements since attending courses taught at a state-approved school would force her to violate the Biblical command not to listen to instruction causing one to err. She stated that if compliance with the statute were ordered, she would be unable to fulfill her religious calling to teach. Parents of children attending the church schools stated that they would not want their children taught by those who were themselves taught other philosophies. For reasons discussed later, we do not find these claims to be supported by the record.

### 3.  COMPELLING STATE INTEREST IN EDUCATION

In *Sherbert,* 374 US 403, the United States

---

[8] 1979 AC, R 390.1115 provides:

The state board reserves the right to determine the acceptability of credits presented for certification from approved teacher education institutions located in other states.

1979 AC, R 390.1125 provides:

An applicant for a provisional certificate shall have been granted a bachelor's degree and shall be recommended by a Michigan college or university approved for teacher education by the state board.

1979 AC, R 390.1130 provides:

The state board *may* issue a provisional certificate to a person who has, or who is reported eligible for, a teaching certificate issued by the certificating authority of any state in which requirements for certification are deemed equivalent to those in effect in this state. [Emphasis added.]

Supreme Court stated that if there were any "incidental burden" on a free exercise right, it must "be justified by a 'compelling state interest within the State's constitutional power to regulate . . . .' "

There is no doubt that a state has a compelling interest in the education of its citizens. In *Pierce v Society of Sisters,* 268 US 510, 534; 45 S Ct 571; 69 L Ed 1070 (1925), the Court, while ruling that a state cannot compel all students to be educated in public schools, noted that

> [n]o question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

In *Brown v Topeka Bd of Ed,* 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954), the Supreme Court again emphasized the magnitude of the state's interest:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child

may reasonably be expected to succeed in life if he is denied the opportunity of an education.

Finally, in *Central Dist No 1 Bd of Ed v Allen,* 392 US 236, 245-247; 88 S Ct 1923; 20 L Ed 2d 1060 (1968), the Supreme Court explicitly acknowledged the state's interest in *private* schools:

> [A] substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction. . . . [I]f the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function.

Michigan particularly has a significant and deeply rooted interest in education. Our Constitution, art 8, § 1, reflects the language of the Northwest Ordinance of 1787:

> Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

Governor James Blanchard elaborated on this in his January 18, 1984, State of the State address:

> For decades, the promise of education has been the ladder of opportunity in this state. Hard-working people, honest people, lived here or came here, knowing that they themselves could earn a decent living working with their hands—but even more important, that their children could find an even better future working with their minds because of

Michigan's fine schools and colleges and universities.

See also *Michigan Female Seminary v Secretary of State,* 115 Mich 118, 120; 73 NW 131 (1897) ("It has always been the policy of this State, as indicated by the provisions of its Constitution and a long line of legislative enactments, to encourage the cause of education.").

It is clear that Michigan's interest in education is long-standing and of the highest importance.

A compelling state interest in education does not necessarily justify *all* forms of educational regulation. For example, in *Yoder,* 406 US 236, the United States Supreme Court balanced the religious claims of the Amish against the state's interest in requiring compulsory education until age sixteen. The Court concluded that despite the state's "admittedly strong interest in compulsory education," it had failed to demonstrate with sufficient particularity how its interest would be adversely affected by granting an exemption to the Amish. The Court placed great emphasis on the adequacy of the Amish vocational education alternative to secondary education, the fact that the Amish children were not going to live in society at large, but in a closed, farming society, and the fact that compulsory high school education could ultimately destroy the Amish community. *Yoder,* 406 US 212. None of these factors are relevant in this case, and, more importantly, the state's interest here is not how much time should be spent in school, but the qualifications of the teachers themselves.

The state's interest in education necessarily extends to an interest in teachers because a primary and vital ingredient to a good education is good

teachers. James Garfield expressed this sentiment in the following manner:

> I am not willing that this discussion should close without mention of the value of a true teacher. Give me a log hut, with only a simple bench, Mark Hopkins on one end and I on the other, and you may have all the buildings, apparatus and libraries without him. [Address to Williams College Alumni, New York, December 28, 1871. Bartlett's Familiar Quotations (14th ed), p 741a.]

Michigan has long recognized the importance of qualified teachers. In 1843, O. C. Comstock, Superintendent of Public Instruction, stated:

> Eligible teachers are all-important. This fact is now more deeply and generally impressed on the public mind than formerly . . . . It was once imagined that almost every man of a competent education could teach a school. But to this proposition there are many exceptions. It does not follow that because a man has received a liberal education, he is therefore a lawyer or physician . . . . And, by parity of reasoning, it is plain that an acquaintance with general literature and science does not, of necessity, prepare one for the arduous but delightful business of educating the underlying mind. Such preparation is chiefly derived from the study of the science and art of teaching. [Jackson, *State Control of Public Instruction in Michigan,* pp 154-155 (1926) (quoting O. C. Comstock).]

Therefore, to the extent that certification of teachers furthers education, it can be considered a compelling state interest. Those certification requirements which involve gaining expertise in a particular substantive field, taking classes in a program of general or liberal education, student teaching, and taking a few basic courses in educa-

tion, are clearly aimed at and closely related to the goal of producing competent teachers.[9]

### 4. STATE'S INTEREST OUTWEIGHS THE MINIMAL INFRINGEMENT

While complying with the certification requirements may mean that schools will have a smaller pool of applicants from which to select their teachers, there is no evidence that acceptable, certified people are not available. Parents have stated that they have no religious objection to having their children taught by certified teachers as long as they are also religiously acceptable to them. Religious school teachers may have to receive more training in order to become certified, but the regulations do not require anyone to attend courses taught from a perspective contrary to their beliefs. The teachers can fulfill all the state certification requirements while attending either a religious or nonreligious institution. For these reasons, we find the infringement on free exercise rights is minimal and is outweighed by the state's interest.

Other state courts confronted with religious objections to the state certification of teachers have found for the state. In *State v Rivinius*, 328 NW2d 220 (ND, 1982), cert den 460 US 1070 (1983), the North Dakota Supreme Court balanced the state's interest in education against parents' right to educate their children in the religion of their choice. The court found that the state law, which

---

[9] As one writer has noted:

It can . . . be assumed that a teacher with a college degree will in almost all cases be a better teacher than one with little or no education. The teacher with a college degree, has, at the very least, demonstrated the mastery of certain basic skills. [Baker, *Regulation of fundamentalist Christian schools: Free exercise of religion v the state's interest in quality education,* 67 Ky L J 415, 427 (1979).]

included a requirement that all teachers be certified by the state, did impose a burden on religion. However, the court found that the compelling state interest in education "outbalances the resulting strain or imposition on the defendants' religious beliefs." *Rivinius,* 328 NW2d 229. The court relied in part on the fact that there was no evidence suggesting that a certified teacher was unable to teach in a manner consistent with the religious beliefs of the parents. See also *Nebraska ex rel Douglas v Faith Baptist Church,* 207 Neb 802; 301 NW2d 571 (1981), app dis 454 US 803 (1981) (state law requiring a baccalaureate degree as a prerequisite to teaching at any school upheld); *State v Shaver,* 294 NW2d 883 (ND, 1980) (certification requirement upheld, in part because religious convictions of the parents did not prohibit the use of certified teachers). Cf. *Kentucky State Bd of Ed v Rudasill,* 589 SW2d 877, 879, n 3 (Ky, 1979), cert den 446 US 938 (1980) (certification requirements for private school teachers held unconstitutional under the *state* constitution. The court noted, "it is obvious that Section 5 of the Kentucky Constitution is more restrictive of the power of the state to regulate private and parochial schools than is the first amendment").

### 5.  *THE REGULATIONS HAVE NOT BEEN APPLIED IN A DISCRIMINATORY MANNER*

The plaintiffs' second allegation is that the certification regulations give the board the power to withhold certificates on the basis of an applicant's religious beliefs. Those portions of the regulations, discussed in part II(B)(2), which give the board the discretion to grant or withhold a certificate on the basis of vague and subjective criteria certainly could be applied in a discriminatory manner. Such

provisions are also less clearly related to the state's goal of producing competent teachers. However, there is no evidence that any applicant who has fulfilled the objective requirements has been denied a certificate because of religious beliefs. Graduates of religious institutions, including both fundamentalist Christian and Catholic schools, have been certified. We assume from this that the board is concerned with the applicant's compliance with the objective requirements and that it does not attempt to determine whether an applicant has a "humanistic" world view or has taken courses taught from that perspective. We therefore find that the certification regulations, as applied, directly further the state's interest in education and do not enable the board to discriminate on the basis of religious beliefs.

### 6. NO LESS INTRUSIVE METHOD IS AVAILABLE TO THE STATE

We are also satisfied that there is no less intrusive method by which the state could satisfy its interest in the education of its citizens. The only alternative which has been proposed is standardized testing of private school students. This is an inadequate substitute because deficiencies in teaching would be discovered only after the damage has occurred. *State v Shaver,* 294 NW2d 883 (ND, 1980). Further, we are not persuaded that testing would guarantee less intrusion by the state into the functioning of the private schools. See, e.g., *Rivinius, supra,* 328 NW2d 229. See also *Johnson v Charles City Community Schools,* 368 NW2d 74, 79 (Iowa, 1985), cert den 474 US —; 88 L Ed 2d 574 (1985) ("[w]hatever limitations are imposed on the state's general right and duty to see to the education of its youth, the right extends beyond occasional testing").

III. OBJECTION TO CERTIFICATION REQUIREMENT ON
THE BASIS OF THE ESTABLISHMENT CLAUSE

In *Lemon v Kurtzman,* 403 US 602, 612; 91 S Ct 2105; 29 L Ed 2d 745 (1971), the Supreme Court stated that in order to survive an Establishment Clause challenge, a statute must meet a three-part test:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, finally, the statute must not foster "an excessive government entanglement with religion." [Citations omitted.]

See also *Grand Rapids School Dist v Ball,* 473 US 373, —; 105 S Ct 3216;  87 L Ed 2d 267, 277 (1985) ("We therefore reaffirm that state action alleged to violate the Establishment Clause should be measured against the *Lemon* criteria.").

The parties here have not discussed the first two parts of this test because it is clear that the statute involved in this case has a secular purpose and that it does not have a primary effect of either advancing or inhibiting religion. With respect to the third part of the test, the circuit court found that teacher certification did cause excessive government entanglement with religion.

In reviewing this conclusion, we are aware that the United States Supreme Court has stated:

> Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples

of necessary and permissible contacts. [*Lemon,* 403
US 614. Citations omitted.]

Those kinds of state actions which have been
found to violate this third prong are those which
create "an intimate and continuing relationship
between church and state." *Lemon,* 403 US 622.
See also *Walz v New York City Tax Comm,* 397
US 664; 90 S Ct 1409; 25 L Ed 2d 697 (1970);
*Wolman v Walker,* 433 US 229; 97 S Ct 2593; 53 L
Ed 2d 714 (1977) (finding that the use of state
funds for nonpublic school field trips would require
close supervision of the nonpublic school teachers,
thus creating excessive entanglement).

In this case, it is clear that requiring all teach-
ers to be certified does not impermissibly tangle
government with religion. The state is merely
enforcing minimum standards with regard to indi-
viduals. The requirement does not involve the
government in any continuing relationship with
the churches or the schools. Once the individual
teacher is certified, the state does not require the
individual to teach from any particular perspec-
tive. We find, therefore, that there is no unconsti-
tutional government entanglement with religion.

### IV. CONCLUSION

We agree with the Court of Appeals that requir-
ing all teachers in the state to be certified is not
unconstitutional. Neither the Free Exercise nor
the Establishment Clauses of the First Amend-
ment support claims to the contrary.

BOYLE, J. (*concurring*). While we concur in the
result reached by the opinion for affirmance, we
write separately to expand both on the nature of
the balancing test which we believe appropriate in

the instant case, and on the issue which divides the Court. The analysis which follows is an effort to distill from prior precedent those principles which will inform our obligation both to "move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemption from generally applicable educational requirements," *Wisconsin v Yoder,* 406 US 205, 235; 92 S Ct 1526; 32 L Ed 2d 15 (1972), and to assure that government authority not improperly inhibit the religious freedom guaranteed by the First Amendment.

I

THE STANDARD OF REVIEW

Primarily at issue in this case is whether the teacher certification requirement imposed by the state impinges upon the plaintiffs' First Amendment right of freedom of religion. According to plaintiffs, also at issue are the fundamental rights of parents to guide the religious future and education of their children, see *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925), as well as the First Amendment right to express, transmit, and receive ideas, see *West Virginia State Bd of Ed v Barnette,* 319 US 624; 63 S Ct 1178; 87 L Ed 1628 (1943), and the liberty to impart and receive religion, see *Cantwell v Connecticut,* 310 US 296, 307; 60 S Ct 900; 84 L Ed 1213 (1940); *Widmar v Vincent,* 454 US 263; 102 S Ct 269; 70 L Ed 2d 440 (1981).

The foregoing claims are distinct and separate, and, if brought individually, the claims would not be reviewed under the same standard. The First Amendment claims would be reviewable under a strict scrutiny or compelling state interest stan-

dard.[1] The standard of review for the Fourteenth Amendment interest of the parents appears to be in a state of flux,[2] but in no case would the standard be higher than that commanded by the First Amendment claims. It follows, therefore, that because the claims are brought together, should the plaintiffs' free exercise challenge not prevail, plaintiffs' other claims could not succeed. Moreover, if plaintiffs' free exercise claims are successful, the need to review plaintiffs' other claims becomes moot. Therefore, we confine our analysis to plaintiffs' free exercise challenge.

The standard for evaluating free exercise claims has not been consistently articulated by the United States Supreme Court.[3] Despite that fact, two constant principles can be identified.

[1] See, e.g., *Wisconsin v Yoder, supra* (free exercise claim), and *United States v O'Brien,* 391 US 367; 88 S Ct 1673; 20 L Ed 2d 672 (1968) (free speech claim).

[2] See *Pierce v Society of Sisters, supra,* compare *Wisconsin v Yoder, supra.* See also *Project, education and the law: State interests and individual rights,* 74 Mich L R 1373, 1434-1435 (1976).

[3] Justice O'Connor summarized the various ways the standard has been articulated in *Goldman v Weinberger,* 475 US —, —; 106 S Ct 1310, 1324; 89 L Ed 2d 478, 498 (1986) (O'Connor, J., dissenting).

In *Sherbert v Verner,* 374 US 398 [83 S Ct 1790; 10 L Ed 2d 965] (1963), and *Thomas v Review Board,* 450 US 707 [101 S Ct 1425; 67 L Ed 2d 624] (1981), the Court required the States to demonstrate that their challenged policies were "the least restrictive means of achieving some compelling state interest" in order to deprive claimants of unemployment benefits when the refusal to work was based on sincere religious beliefs. *Thomas, supra,* at 718. See also *Sherbert, supra,* at 406-408. In *Wisconsin v Yoder,* 406 US 205, 215 (1972), the Court noted that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion" in deciding that the Amish were exempt from a State's requirement that children attend school through the age of 16. In *United States v Lee,* 455 US 252, 257-258 [102 S Ct 1051; 71 L Ed 2d 127] (1982), the Court stated that "[t]he State may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest," and held that the Amish could not exempt themselves from the Social Security system on religious grounds. See also *Gillette v United States,* 401 US 437 [91 S Ct 828; 28 L Ed

First, when the government attempts to deny a Free Exercise claim, it must show that an unusually important interest is at stake, whether that interest is denominated "compelling," "of the highest order," or "overriding." Second, the government must show that granting the requested exemption will do substantial harm to that interest, whether by showing that the means adopted is the "least restrictive" or "essential," or that the interest will not "otherwise be served." [*Goldman v Weinberger,* 475 US —, —; 106 S Ct 1310, 1325; 89 L Ed 2d 478, 498 (1986) (O'Connor, J., dissenting).][4]

## The difficulty in articulating a standard for free

2d 168] (1971) (rejecting claims under the Establishment and Free Exercise Clauses to the Federal Government's refusal to give conscientious-objector status to those objecting on religious grounds only to a particular war rather than to all wars).

4 Compare *United States v O'Brien, supra,* 376-377:

> We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is not greater than is essential to the furtherance of that interest. We find that the 1965 Amendment to § 12(b)(3) of the Universal Military Training and Service Act meets all of these requirements, and consequently that O'Brien can be constitutionally convicted for violating it.

exercise claims pales considerably in comparison to the difficulty encountered in the application of the standard. At a minimum, application of the standard is a balancing process requiring great circumspection in performing the sensitive and delicate weighing of a state's legitimate social interest and a request for a religious exemption.[5]

Contrary to the opinion for reversal, we do not believe that the belief/action and direct/indirect interference dichotomies have long been abandoned when it is necessary to determine the scope of protections afforded by the First Amendment.[6] Indeed, the former has been reiterated and the latter debated in an opinion issued by the United States Supreme Court on June 11, 1986.[7]

The Freedom of Religion Clause of the First Amendment embraces two concepts—the freedom to believe and the freedom to act.

> The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. [*Cantwell v Connecticut,* 310 US 296, 303-304; 60 S Ct 900; 84 L Ed 1213 (1940).][8]

---

[5] See *Wisconsin v Yoder, supra,* 235.

[6] Our cases have long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not absolute. [*Bowen v Roy,* 476 US —, —; 106 S Ct 2147, 2152; 90 L Ed 2d 735, 744 (1986).]

[7] While Justice Brennan's opinion for the Court in *Sherbert v Verner,* n 3 *supra,* would appear to have eliminated the distinction, the controversy between Justice Burger and Justice O'Connor in *Bowen v Roy,* n 6 *supra,* demonstrates that the issue still has vitality.

[8] It is true that activities of individuals, even when religiously

Where the regulation involved conflicts directly with a religious practice, "accommodation between the religious action and an exercise of state authority is a particularly delicate task [*Prince v Massachusetts*, 321 US 158, 165; 64 S Ct 438; 88 L Ed 645 (1944)], because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." *Braunfeld v Brown*, 366 US 599, 605; 81 S Ct 1144; 6 L Ed 2d 563 (1961). But where the burden on the exercise of religion is indirect, i.e., the legislation does not make the religious practice itself unlawful, the most critical scrutiny must be employed or the operating latitude of the Legislature would be severely restricted. *Id.*, 606.

Admittedly, "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion," *Wisconsin v Yoder, supra,* 220, citing *Sherbert v Verner*, 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963), that is, if, although indirect, the effect of the regulation is to put "substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . ." *Thomas v Review Bd of Indiana*, 450 US 707, 718; 101 S Ct 1425; 67 L Ed 2d 624 (1981). However, if the state regulates conduct by enacting a neutral law within its

based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers. . . . But to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability. [*Wisconsin v Yoder, supra,* 220. Citations omitted.]

power, the purpose and effect of which is to further the state's secular goals, the statute may be valid despite its indirect burden on religious practice unless the state's purpose may be achieved through less burdensome means. *Braunfeld v Brown, supra,* 607.[9]

The fundamental issue which divides this Court is the nature of the proofs required by the parties in order to satisfy their respective burdens in this free exercise case, an issue which the United States Supreme Court has not directly addressed.[10] In our judgment, it is apparent from Supreme Court precedent that the extent and nature of the burden imposed by the enforcement of the regulation is relevant to the kind and quantity of proofs required by the government to satisfy the strict scrutiny test. Cf. *Wisconsin v Yoder, supra; United States v Lee,* 455 US 252; 102 S Ct 1051; 71 L Ed 2d 127 (1982); *Braunfeld v Brown, supra,* and

---

[9] Despite the accusation of the opinion for reversal, we do not suggest that "legislation which imposes only indirect burdens upon the free exercise of religion . . . is *outside* the protections afforded by the Free Exercise Clause, or that such legislation mandates a lower level of judicial scrutiny . . . ." *Post,* p 572.

[10] In *State v Patzer,* 382 NW2d 631 (ND, 1986), cert den 479 US —; 93 L Ed 2d 50 (1986), the North Dakota Supreme Court found for the state in spite of the fact that the state did not formally introduce any evidence during the lower court proceedings relating to "compelling state interest" and "least restrictive means." The defendants in that case unsuccessfully sought leave to appeal to the United States Supreme Court raising three questions for that Court's consideration:

(1) Can the state satisfy its burden of establishing compelling state interest if it introduces no evidence of any kind to substantiate its assertions of such interest? (2) Is there proof that compelling state interest is served when there is no scientific or academic evidence that children learn better from certified teachers than when they are taught by their uncertified parents at home? (3) Has North Dakota chosen the least restrictive alternative to assure its interests in education, in view of [the] fact that all 22 states enacting home school laws in [the] past 30 years have not made such [a] requirement? [55 USLW 3101 (August 12, 1986).]

compare *Goldman v Weinberger, supra.* It also appears that a belief/action and direct/indirect analysis remains indispensable to the delicate balancing required of this Court because this analysis relates to both the degree that the regulation is neutral and the degree to which the challenged regulation interferes with the religious practice or belief.[11]

The opinion for reversal characterizes as "inescapable" the conclusion that the certification requirement is a direct regulation of plaintiffs' religious activity. The opinion thereby eschews examination of the nature and extent of the burden on plaintiffs' First Amendment rights and proceeds directly to application of the compelling state interest analysis. Our colleague's characterization of the nature of these claims seems to follow from the willingness to accept the premise that all state regulation of religious schools is a direct restraint on religious liberty.

While taking us to task for allegedly interpreting plaintiffs' religious beliefs and requirements, our colleague herself characterizes the religious burden in a manner which inexorably dictates the conclusion.[12] No less than three times does the opinion for reversal characterize the burden on

[11] See also Baker, Comments, *Regulation of fundamentalist Christian schools: Free exercise of religion v the state's interest in quality education,* 67 Ky L J 415, 417-420 (1978-1979).

[12] In *Illinois State Bd of Elections v Socialist Workers Party,* 440 US 173, 188-189, 99 S Ct 983; 59 L Ed 2d 230 (1979), a case concerning the First Amendment right to associate, Justice Blackmun wrote:

Although we join the Court's opinion and its strict-scrutiny approach for election cases, we add these comments to record purposefully, and perhaps somewhat belatedly, my unrelieved discomfort with what seems to be a continuing tendency in this Court to use as tests such easy phrases as "compelling [state] interest" and "least drastic [or restrictive] means." . . . we have never been able fully to appreciate just what a "compelling state interest" is. If it means "convincingly controlling," or "incapable of being overcome" upon any balancing process,

plaintiffs' religious beliefs as "substantial." *Post,*
pp 545, 550, 555. A court may not interpret an
individual's religious beliefs or requirements,
*United States v Lee, supra,* 257; *Thomas v Review
Bd of Indiana, supra,* 716. However, unless an
allegation of a burden on a sincerely held religious
belief is to automatically require invalidation of a
governmental regulation, a court must analyze the
degree of the burden.[13]

A

Plaintiffs' primary objection to the teacher certi-
fication requirement is that "no one may carry out
a teaching ministry in a church-school without a
government permit to do so. . . ." Plaintiffs do not
contend that they were denied a certification to
teach upon the basis of their religious beliefs.
Were this the basis of their objections, plaintiffs
would be clearly entitled to relief, for "[t]he Free
Exercise Clause categorically prohibits government

---

then, of course, the test merely announces an inevitable result,
and the test is no test at all. And, for me, "least drastic means"
is a slippery slope and also the signal of the result the Court
has chosen to reach. A judge would be unimaginative indeed if
he could not come up with something a little less "drastic" or a
little less "restrictive" in almost any situation and thereby
enable himself to vote to strike legislation down. This is remi-
niscent of the Court's indulgence, a few decades ago, in substan-
tive due process in the economic area as a means of nullifica-
tion.

I feel, therefore, and have always felt, that these phrases are
really not very helpful for constitutional analysis. They are too
convenient and result oriented, and I must endeavor to disasso-
ciate myself from them. [Citations omitted.]

More recently, in *Bowen v Roy,* n 6 *supra,* 90 L Ed 2d 749, n 17,
three other justices expressed doubt concerning the propriety of
applying strict scrutiny to free exercise claims. See n 21.

[13] In our view, the certification requirement can only be viewed as a
direct restraint on plaintiffs' free exercise rights if the contention is
accepted that all secular regulation of private religious schools vio-
lates the First Amendment, a conclusion which is unsupported by any
previous precedent.

from regulating, prohibiting, or rewarding religious beliefs as such." *McDaniel v Paty,* 435 US 618, 626; 98 S Ct 1322; 55 L Ed 2d 593 (1978).

Slightly rephrased, plaintiffs' objection is that they are precluded from teaching on the basis of their uncertified *status.* By Michigan law, the certified status involved here is defined in terms of conduct, not belief.[14] Because the state requirement is focused on status, conduct, and acts, this Court "should be cautious in expanding the *scope* of [the absolute protections afforded belief by the First Amendment] since to do so might leave government powerless to vindicate compelling state interests." *McDaniel v Paty, supra,* 627, n 7 (emphasis supplied).[15]

B

The burden on plaintiffs' religious practices is also indirect. The pastors' primary objection to teacher certification is their belief that God has given them the criteria by which to discern who should teach their children, and that licensure itself is an infringement on their religious liberty. Plaintiffs' religious tenets do not prohibit them from hiring a teacher simply because the teacher is certified. The record establishes that certified teachers are employed by the schools.[16] Further,

---

[14] See WILLIAMS, C.J., *ante,* pp 472-473.

[15] Cf. *Wisconsin v Yoder, supra,* 234-235; *Braunfeld v Brown, supra,* 606.

[16] Plaintiff Sharon E. Swain, a parent whose children attend Bridgeport Baptist Academy, testified that she had no religious objection to having her children taught by a person possessing a Michigan teacher's certificate. Testimony to a similar effect was elicited from Michael D. Cox and Gregory and Susan Boese, also parents of children in attendance at the school.

Gerald M. Somero, pastor of Sheridan Road Baptist Church, testified that a certified teacher could teach at the church school without violating the tenets of the church, and that the church school currently employed a certified teacher.

while there was testimony indicating that plaintiffs believe courses of study leading to certification teach a humanistic, rather than a religious approach to education, the record does not establish and indeed belies the conclusion that pursuing such courses compromises in any way the plaintiffs' ability to teach from a religious point of view.[17] Rather, the burden asserted, in plaintiffs' own words, is that "engaging *only* government certified teachers in its school ministry is abhorrent to their scriptural beliefs." Although every First Amendment objection based on the religion clauses involves an objection to governmental compulsion, in this case it is not the certification that is "abhorrent," but the possibility that the government certification requirement will limit the pool of individuals from which the schools can hire their teachers.

This objection, although couched in religious terms, borders on secular concerns. The economic and administrative burden imposed by the certification requirement is clearly more palpable than the burden on plaintiffs' religion. According to the record, there are religious institutions in existence which provide the classes required for certification and which teach the classes in a manner unobjectionable to plaintiffs' religious beliefs. Moreover, it may be possible for teachers at the schools to satisfy the educational requirements for certifica-

---

[17] The record indicates that William Swain, a teacher at the Bridgeport school at the time testimony was taken in this case, did possess a Michigan teaching certificate. Iris Kwaitkowski, also a teacher at the Bridgeport school, testified that she received a South Carolina teacher's certificate upon her graduation from the Bob Jones University in Greenville, South Carolina. She further testified that she only needed a Michigan history course in order to be eligible for a Michigan teacher's certificate. Although Ms. Kwaitkowski claimed that she would not pursue a Michigan teacher's certificate because she did not want to "listen to instruction that causes [her] to err," she did not testify that certification would affect her ability to pursue her teaching ministry.

tion by presenting evidence of an equivalent as determined by the state board such as college graduation, standardized examination scores, prior teaching experience, or any combination of these or other appropriate criteria. 1979 AC, R 390.1152. Plaintiffs' teaching mission appears, therefore, more inconvenienced by the certification requirement rather than precluded.

Without doubt, an integral part of plaintiffs' beliefs is that it is their duty and right to educate their children in the manner they believe is best for their children. Our respect for the sincerity of their beliefs does not, however, require us to lose sight of the fact that the education of plaintiffs' children is also a well-established compelling concern and a constitutional interest of the state, Const 1963, art 8, § 1.[18] The United States Supreme Court has long recognized that the parents' right to educate their children in the school of their choice is subject to the state's interest in assuring that every child receive at least a minimal education.[19] Moreover, regulation of the teaching profes-

[18] *Wisconsin v Yoder, supra,* p 213. See also *Pierce v Society of Sisters, supra,* 534; *Brown v Topeka Bd of Ed,* 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954).

[19] In *Central Dist No 1 Bd of Ed v Allen,* 392 US 236, 245-247; 88 S Ct 1923; 20 L Ed 2d 1060 (1968), the United States Supreme Court explained the relationship between the two interests:

In the leading case of *Pierce v Society of Sisters,* 268 US 510 (1925), the Court held that although it would not question Oregon's power to compel school attendance or require that the attendance be at an institution meeting State-imposed requirements as to quality and nature of curriculum, Oregon had not shown that its interest in secular education required that all children attend publicly operated schools. A premise of this holding was the view that the State's interest in education would be served sufficiently by reliance on the secular teaching that accompanied religious training in the schools maintained by the Society of Sisters. Since *Pierce,* a substantial body of case law has confirmed the power of the States to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide mini-

sion is a recognized and identifiable means of furthering that state interest. See *Central Dist No 1 Bd of Ed v Allen,* 392 US 236, 245-247; 88 S Ct 1923; 20 L Ed 2d 1060 (1968).

## II

### THE BALANCING PROCESS DESCRIBED

The standard for free exercise claims is a balancing test which countenances shifting burdens of persuasion in proportion to proofs admitted at trial. For example, once a plaintiff has established that a regulation burdens the exercise of religion, the state must establish that a "compelling state interest" is at issue and that the interest cannot otherwise be served. If the plaintiff sets forth alternative means which rebut the government's claim of necessity, then the state is required to show with more particularity that no lesser restrictive alternative is available. Compare *Wisconsin v Yoder, supra,* 234-236.

The balancing process which is required has been diversely described by the United States Supreme Court.[20] In *Sherbert v Verner, supra,* 403, the Court applied traditional "strict scrutiny" review and required that a governmental regulation which burdens the free exercise of religion be

mum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction. Indeed, the State's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with compulsory education statutes. These cases were a sensible corollary of *Pierce v Society of Sisters:* if the State must satisfy its interest in secular education through the instrument of private schools, it has a proper interest in the manner in which those schools perform their secular educational function.

[20] See n 3.

justified by a "compelling state interest."[21] In *Wisconsin v Yoder, supra,* 214, the Court required a showing of a "sufficient" state interest to override the burdened religious interest. See also *United States v Lee,* 455 US 252, 257-258; 102 S Ct 1051; 71 L Ed 2d 127 (1982). One commentator has observed that the Court's failure to use the "compelling state interest" language "suggest[s] the use

---

[21] While the strict scrutiny standard as variously described remains the appropriate standard and is applied in the case at bar, this test has also been recently criticized by three justices of the United States Supreme Court in the free exercise context:

> It is readily apparent that virtually every action that the Government takes, no matter how innocuous it might appear, is potentially susceptible to a Free Exercise objection. For example, someone might raise a religious objection, based on Norse mythology, to filing a tax return on a Wednesday (Woden's day). Accordingly, if the dissent's interpretation of the Free Exercise Clause is to be taken seriously, then the Government will be unable to enforce any generally applicable rule unless it can satisfy a federal court that it has a "compelling government interest." While libertarians and anarchists will no doubt applaud this result, it is hard to imagine that this is what the Framers intended. [*Bowen v Roy,* n 6 *supra,* 90 L Ed 2d 749, n 17 (opinion of Chief Justice Burger, with Justices Powell and Rehnquist concurring).]

Chief Justice Burger's comment appears to be based in part upon the expansive view of religion taken by the Supreme Court in free exercise cases. While the Court has expressed the view that beliefs based on secular considerations are not entitled to the same deference as beliefs based on religious concerns, see *Wisconsin v Yoder, supra,* 215-216, cf. *Braunfeld v Brown, supra,* 605-606, the Court has consistently indicated a willingness to accept a petitioner's assertion that the enforcement or adherence to a regulation is a burden upon the petitioner's religious belief without questioning the petitioner's interpretation of that religious belief. See, e.g., *United States v Lee, supra,* 257; *Thomas v Review Bd of Indiana, supra,* 716. This approach is based on an aversion to the Court's formulation of a definition of religion, a most delicate endeavor which could pose a threat to religious pluralism.

Given the present posture of the Supreme Court, it is not difficult to embrace Chief Justice Burger's prediction. It is more likely, however, in our judgment, that rigid application of the compelling state interest standard articulated in the dissent to *Bowen v Roy* will result in an unfortunate dilution of the standard itself. See also Note, *The myth of religious neutrality,* 71 Va L R 127, 159 (1985).

of a more open balancing test." Nowak, Rotunda & Young, Constitutional Law (2d ed), p 1060.

At least one member of the United States Supreme Court has posited that the majority of decisions has placed "an almost insurmountable burden on any individual who objects to a valid and neutral law of general applicability on the ground that the law proscribes [or prescribes] conduct that his religion prescribes [or proscribes] . . . ."[22] Although this is the pronounced view of only one justice, we cannot ignore the conclusion that even the Supreme Court has acknowledged that certain government interests are so compelling that the state need not show that the means chosen is absolutely essential to further that interest, and that no lesser restrictive alternative could be substituted. It thus appears that the degree of importance attached to the governmental interest can well dictate the extent the government is required to diminish the effectiveness of the regulation by granting an exemption.[23]

---

[22] *United States v Lee, supra,* 263 n 3 (Stevens, J., concurring). Justice Stevens further noted, "The principal exception is *Wisconsin v Yoder* in which the Court granted the Amish an exemption . . . by actually applying the subjective balancing approach it purports to apply today. . . . There is also tension between this standard and the reasoning in *Thomas v Review Board of Indiana Employment Security Div* and *Sherbert v Verner.* Arguably, however, laws intended to provide a benefit to a limited class of otherwise disadvantaged persons should be judged by a different standard than that appropriate for the enforcement of neutral laws of general applicability." (Citations omitted.)

[23] Once it is shown that the law burdens the practice of a religious belief the state must show that it has an overriding or compelling secular reason for refusing to grant an exemption from the regulation. In balancing the interest the court must first determine the degree of burden on the religious practice. Then, in assessing the state's interest, the court will have to determine the importance of the secular interest and the extent to which that interest would be impaired by an exemption for the religious practice. *If the state interest is truly compelling,*

Those cases in which the state has failed in its burden are the exceptions, not the rule.[24] They have occurred where the effect of a law on religious practices is severe and, as in *Yoder, supra,* where a lesser restrictive alternative has been clearly and convincingly established by the plaintiffs challenging the regulation,[25] or where the interest of the state in refusing to extend a legislative exemption has been found subordinate to the free exercise rights of those who were deprived by that interest and has suggested a discriminatory intent.[26] *Sherbert v Verner, supra; Thomas v Review Bd of Indiana Employment Security, supra.*

> *there will be no requirement that the state diminish the effectiveness of its regulation by granting the exemption. However, if the state could achieve its goal as well by a means which would not burden the religious practice, it will be required to adopt the alternative means. If the state's interest is of a lesser magnitude it will be required to grant the exemption and accept a less effective means of fulfilling its goal.* [Nowak, Rotunda & Young, *supra,* 1054. Emphasis added.]

[24] The state was found to have met its burden in the following cases: *Goldman v Weinberger,* 475 US —; 106 S Ct 1310; 89 L Ed 2d 478 (1986) (military regulations); *United States v Lee, supra* (social security laws); *Gillette v United States,* 401 US 437; 91 S Ct 828; 28 L Ed 2d 168 (1971) (selective service laws); *Braunfeld v Brown, supra* (Sunday closing laws); *Prince v Massachusetts,* 321 US 158; 64 S Ct 438; 88 L Ed 645 (1944) (child labor laws); *Reynolds v United States,* 98 US 145; 25 L Ed 244 (1878) (polygamy law).

[25] The opinion for reversal concludes from our observation of what occurred in *Yoder* that we would hold that the burden on plaintiffs in free exercise cases is to clearly and convincingly establish the existence of a lesser restrictive alternative to the challenged regulation. *Post,* p 574. We have never stated that this is the law. Rather, we have only taken note of the fact that the United States Supreme Court in *Yoder* explained in great detail why the Amish were entitled to an exemption from the compulsory education regulation in that case. In doing so, they found the fact that the Amish had "carried the even more difficult burden of demonstrating the adequacy of their alternative mode of continuing informal vocational education in terms of precisely those overall interests that the State advances in support of its program of compulsory high school education" of particular significance. 406 US 235.

[26] Concerning *Sherbert* and *Thomas,* Chief Justice Burger recently explained:

Those exceptions are clearly distinguishable from the case at bar.

### A

In *Wisconsin v Yoder, supra,* 215, the balancing test was based on "the quality of the claims of the respondents concerning the alleged encroachment of Wisconsin's compulsory school-attendance statute on their rights and the rights of their children to the free exercise of the religious beliefs they and their forebears have adhered to for almost three centuries." In that case the Amish persuasively established almost three hundred years of consistent practice which pervaded and regulated the respondents' entire mode of life. This evidence supported their claim that "enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise" of their religious beliefs. *Id.,* 219.

The *Yoder* Court accepted the proposition that "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Id.,* 221. It also recog-

The statutory conditions at issue in those cases provided that a person was not eligible for unemployment compensation benefits if, "without good cause," he had quit work or refused available work. The "good cause" standard created a mechanism for individualized exemptions. If a state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship suggests a discriminatory intent. Thus, as was urged in *Thomas,* to consider a religiously motivated resignation to be "without good cause" tends to exhibit hostility, not neutrality, towards religion. [*Bowen v Roy,* n 6 *supra,* 106 S Ct 2156; see also *Sherbert, supra,* 401-402, n 4; *United States v Lee, supra,* 264, n 3 (Stevens, J., concurring) (*Sherbert* and *Thomas* may be viewed "as a protection against unequal treatment rather than a grant of favored treatment for the members of the religious sect").]

nized that education prepares citizens to become self-reliant and self-sufficient participants in society.

The Court then found that the Amish had carried the burden of demonstrating the sufficiency of their alternative mode of continuing informal vocational education in the same terms of those interests advanced by the state in support of its compulsory high school education. *Id.,* 235. It was then, the Court concluded, that in light of this convincing showing, and considering the minimal difference between what the state required and the Amish accepted, the state must show with more particularity how the admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish. *Id.,* 235-236.

The most recent case applying the balancing test we believe appropriate where a paramount government interest is demonstrated is *Goldman v Weinberger, supra.* In *Goldman,* a case decided this year, the petitioner contended that the Free Exercise Clause permitted him to wear a yarmulke while in uniform despite a United States Air Force regulation mandating uniform dress for Air Force personnel. The ultimate governmental interest at stake was congressional authority to raise and support armies and to regulate their performance. The intermediate goals or interests asserted were discipline, uniformity, the need to inculcate the virtue of obedience, and the subordination of the interests of the individual to the needs of the service. In order to achieve these objectives, the military promulgated dress regulations. Such regulations, as interpreted, prohibited the wearing of the yarmulke.

The petitioner asserted that his religious beliefs *required* him to wear the yarmulke and that,

under *Sherbert v Verner, supra,* and *Wisconsin v Yoder, supra,* the regulation as applied to him burdened his free exercise of religion. A majority held that the governmental interest in the military is so important that any regulation which reasonably relates to achievement of any of the asserted intermediate interests was permissible even though the effect of the regulation was to cause a person to violate his religious beliefs.

Whereas the opinion for reversal in this case argues that it is inescapable that *Sherbert v Verner, supra,* sets the standard for all claims of violation of free exercise of religion, in *Goldman* only two justices agreed. Justices O'Connor and Marshall applied that standard and, in dissent, held that the granting of an exemption should be required. Justice Blackmun, in dissent, would have required an exemption as well, but he declined to apply *Sherbert* because the military was involved.

Seven of nine justices agreed that the granting of an exemption would create no danger of impairment of the military mission of the Air Force. Three justices, in a separate concurring opinion, noted that where a regulation is neutral regarding religion, is based on an objective standard, is not motivated by hostility against, or any special respect for, any religious faith, to require an exemption simply because the governmental interest would not be impaired, thereby would invite nonuniform treatment for members of different religious faiths.[27]

---

[27] It may be argued that *Goldman,* based on the military interest, is *sui generis.* If that argument is sound, then five members of our nation's highest court have no fidelity to the constitution. The First Amendment makes no exception for the military. The military in this free society is not a separate branch of government. It is subordinate to the President and Congress. It acts under laws created by Congress. The First Amendment proscribes laws made by Congress which prohibit the free exercise of religion.

The issue in the conflict between religiously motivated conduct and the military interest in uniformity of dress was resolved as it was because a majority recognized the paramount importance of the military interest. Although a majority of justices applied a rational basis test, a standard clearly not applicable here, *Goldman* nonetheless refutes any mechanistic and simplistic application of *Sherbert* to all free exercise claims. The point is that the congressional power to raise and regulate armies, including the requiring of uniform dress, is so important that the most important of personal rights, the free exercise of religion, even where directly burdened, must give way to the governmental regulation even where the relationship between the governmental interest and the means to achieve it is not only not essential or necessary, but the logical nexus is far from clear. *Goldman* suggests that the higher in rank the governmental interest, the less the need for necessity to support the means chosen to achieve it even where paramount personal rights are directly burdened.

**B**

The opinion for reversal sharply criticizes both the opinion of Chief Justice WILLIAMS and this opinion for articulation and application of the standard of review in this case. *Post,* pp 566-578. In summary, the opinion for reversal states that the standard for review in free exercise claims is clear. Once the claimant has asserted that a governmental regulation burdens the free exercise of religion, the government is obligated to articulate and prove that it has a compelling interest, that the means selected to achieve that end is essential for that purpose, that no means less burdensome to free exercise exists to achieve such purpose, and

that the granting of the exemption would effectively destroy the government's ability to achieve its purpose.

Our colleague implies, further, that the claim of religious practice as well as the burden thereon is defined by the claimant and that scrutiny of the claim is perhaps beyond the competence of the judiciary.

While the test used by Chief Justice WILLIAMS' opinion and in this opinion is articulated somewhat differently, we have applied the test articulated by the opinion for reversal in this case. Whether Supreme Court precedent requires this standard remains unclear. From the case law, however, the following factors do emerge as required considerations.

One obvious factor is the governmental interest. As *Yoder* and *Goldman* teach, questions regarding the importance of the interest are inescapable. As a practical matter, the level of abstraction employed by a court in recognizing the interest can often be controlling. The higher the level of generality, in general, the better the government will fare in the contest. The more concrete or fact-specific the interest recognized, the worse the government will fare in the balancing.

A second and third factor involve the means chosen by government to achieve its interest and the logical nexus between the end and the means. Evaluation of the latter relationship involves concepts such as necessity, essentiality, broadness versus narrowness, objective versus subjective, whether the regulation is one of general application, and whether the regulation is one of several different ways to accomplish the objective or is the only way of doing so. In short, the stronger and more direct the logical nexus, the better the government will fare in the balancing.

A fourth factor is the private right asserted as affected. The rank given to such a right is also an inescapable consideration. Whether the right is explicit in the constitution, whether a court is asked to recognize such a right as a matter of first impression, or whether the right is claimed to exist by extension of, or analogy to, other explicit rights, some definition of the scope and nature of the right asserted is necessary. A fifth apparent factor is the nature of the conflict between the private right and the means chosen by the government to achieve its objective. Among other formulations of the concept employed here are direct versus indirect, belief versus conduct, purpose versus effect, and least restrictive alternative.

A sixth factor is the extent of the conflict. At this point in the analysis the amount of the burden or restraint is relevant, as well as to what extent the state's effectiveness in achieving its goal would be diminished if required to relieve the burden. A final factor is the role of the individual exemption. Whether it is required to be offered depends upon analysis of the above six factors.

If the governmental objective is compelling, if the means to achieve it is closely and narrowly drawn, and if the effect on religious exercise is indirect, unintended, and marginal, then an exemption as an alternative to avoid the claimed conflict is not necessary.

In summary it appears that the higher the rank of the governmental interest, the stronger the logical nexus between such interest and the means selected to accomplish it, the less important the private right, the less direct the conflict between the exercise of the right and the regulation in question, and the lower the amount of the burden, the less likely the claimant will win in the balanc-

ing process. A mathematically certain formula cannot be created which accounts for the internal evaluation of each factor and its relative weight with respect to each other factor. The essential judicial task is to evaluate asserted conflicts between private rights and public interests to ensure that neither is compromised or destroyed.

III

ANALYSIS OF THE PLAINTIFFS' CLAIMS

Turning to the claims advanced by plaintiffs in the case at bar, we are unconvinced that compliance with the state teacher certification program will endanger or restrict the free exercise of their religious beliefs. The state's interest in education is paramount. The means selected to achieve that end, that is, a certification program to require that only academically qualified teachers are used to fulfill the mandatory educational requirements is narrowly drawn to accomplish that objective. The means selected is also neutral regarding religion, is based on an objective standard, and is not motivated by hostility against, or any special respect for, any religious faith. Moreover, ensuring that teachers are academically qualified is an independent legitimate state interest.

The private right asserted is extremely important, but the nature and extent of the conflict are far less clear. On this record it does not appear that certification, as such, contravenes plaintiffs' beliefs (as churches, pastors, teachers, or parents) except to the extent that some plaintiffs assert that any and all regulations of their church schools violate their religious beliefs.

Indeed, plaintiffs' free exercise claim is that certification itself is not opposed, but the govern-

ment compulsion to attain it.[28] While plaintiffs object, on a religious basis to a course of study that teaches humanistic values, this objection is directed not to certification but to the institutions through which it is obtained. Pastor Ouellette testified that it is his belief that God has determined the criteria for the teaching ministry and that because there are very few people of plaintiffs' beliefs who have a teaching certificate, the certification requirement would make it very difficult and very burdensome to provide teachers for their schools.

Neither pastor testified to a religious objection to hiring certified teachers or that the requirement would force closure of their schools, and the record establishes that it is possible to become qualified for a state teaching certificate through a number of ways in harmony with plaintiffs' beliefs. It thus appears that the certification requirement alone neither compels plaintiffs to refrain from religiously motivated conduct nor to engage in conduct they find objectionable. Certification, qua certification, does not contravene either the pastors' or the teachers' religious beliefs.

The only alternative for teacher certification offered in these proceedings is student testing. But, as the majority aptly points out, this testing comes too late.[29] The teacher certification requirements are essentially prophylactic in nature. Certification does not guarantee that a person will be an effective teacher, but it increases the probability that a

[28] In their reply brief, plaintiffs stated their central contention of injury: "[T]he Churches' point is not that a certified teacher may not teach in the Churches' schools, it is that restricting the freedom of churches to engaging *only* government-certified teachers in its school ministry is abhorrent to their Scriptural beliefs."

[29] We also agree with Chief Justice Williams that testing could result in the schools "teaching to the test," thus allowing more intrusion by the state into the functioning of private schools. See *ante,* p 484.

teacher will be competent. Therefore, the certification requirements help prevent children from being exposed to unqualified teachers. Testing can at best only identify problems that require remedies. Testing, therefore, does not fulfill the prophylactic goal of the state's requirement.

There was also testimony offered by plaintiffs that the free market will naturally operate to eliminate inadequate schools. But plaintiffs offered no testimony that the children who attend such inadequate schools prior to their identification and elimination will not be harmed.

We further note that the plaintiffs' pastors and plaintiffs' own expert agreed that academic qualifications are desirable in the teaching profession. Plaintiffs' expert also listed other factors he considered important in a good teacher such as talent, dedication, and ethical convictions. But these characteristics are not susceptible to the type of government regulation involved here. As a preventive measure assuring at least a minimal competency, academic qualifications for teachers are the only requirements a government can objectively establish.

Unlike the Amish in *Yoder,* the departure from the requirements of the state here are not minimal. Carried forward, the logic of the position advanced by plaintiffs would require the state to give up any attempt to advance its interest in fostering education whenever persons opt for religious education as a matter of religious conviction. Such a result could effect a substantial deregulation of the teaching profession in the private sector, a profession critical to the proper and necessary education of our citizens.[30] The record here

---

[30] See also n 33.

does not establish the long history of the Amish indicating the competence of their alternative method for selecting qualified teachers so as to ensure that the government interest in educating the citizenry is not endangered. Moreover, the children involved here will not return to an isolated agrarian community, but will be assimilated into modern society as a whole, a factor requiring closer scrutiny of plaintiffs' claims.

The plaintiffs in the case at bar have not established a case as strong and assuring as that established by the Amish in *Yoder.* For that reason, we do not find it necessary to require the state in this case to show with more particularity how its compelling interest in compulsory education will be adversely affected by granting an exemption to plaintiffs.[31]

The teacher certification requirements represent, at once, a compelling state interest of their own right and a state regulation narrowly drawn to achieve the broader goal of quality education. They constitute, at most, an indirect and minimal burden on the free exercise of religion by plaintiff.

## IV

### SUMMARY

In *Sherbert v Verner, supra,* and *Thomas v*

---

[31] The opinion for reversal finds "curious" our analysis of the free exercise claim in this case. *Post,* pp 543-544, n 34. The reason for this, in our estimation, is that, while asserting that the burden on plaintiffs' free exercise of religion is both apparent and substantial, the opinion for reversal appears to actually proceed from the premise that *any* interference with a sincere religious belief or practice triggers the compelling state interest analysis. The opinion is well-written and aggressively presented. It may even be a sound prognostication of the outcome in the United States Supreme Court if and when that Court confronts the issue. It is, however, simply a prognostication. We have written to describe the analysis of that precedent which we conclude is required in the instant case. As the legion of scholarly comment on the Free Exercise Clause illustrates, if there is one thing that is clear in the history of the United States Supreme Court cases on free exercise issues, it is that very little is clear.

*Review Bd, supra,* the Court reaffirmed a thirty-nine-year-old principle: A state may not exclude "Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation." *Everson v Ewing Twp Bd of Ed,* 330 US 1, 16; 67 S Ct 504; 91 L Ed 711 (1947) (emphasis deleted). In those cases, the states were unable to demonstrate a sufficiently compelling governmental interest. See *Thomas, supra,* 719 and *Sherbert, supra,* 406-409. Thus, the question whether the states' interests could be served through less burdensome means was not reached.

In the case at bar, "[t]here is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." *Wisconsin v Yoder, supra,* 213. This paramount responsibility has been made to yield to the right of parents with respect to the religious upbringing of their children only when the parents have assured an equivalent education in a privately operated system. *Wisconsin v Yoder, supra; Pierce v Society of Sisters, supra.*

This Court must not lose sight of the fact that our courts "are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discreet aspects of a State's program of compulsory education."[32] *Wisconsin v Yoder, supra,* 235. As the

[32] The opinion for reversal takes judicial notice of the fact that the majority of states do not currently impose certification requirements upon teachers at nonpublic schools; that where they have been imposed, the trend is to grant exemptions for religious schools; and that the Michigan Legislature is currently considering altering this state's teacher certification program. *Post,* pp 561-562, ns 58-60. We question the relevancy of this information. The issue before us is whether an exemption to the certification requirements is constitutionally mandated, not how the Legislature should develop its education program. We further note that the legislation pending in Michi-

United States Supreme Court has cautioned, "[t]his should suggest that courts must move with great circumspection in performing the sensitive and delicate task of weighing a State's legitimate social concern when faced with religious claims for exemptions from generally applicable educational requirements." *Id.*, 235.

In the case sub judice, an alternative means by which the state can ensure that academically qualified teachers will further its interest in providing education to its citizenry has not been established. Although certification is not a guarantee of teacher competence, logic and experience indicate that it furthers that goal. The lack of statistics bearing out this corollary is not due to the fact that the corollary does not exist, but rather is because it is impossible to isolate the effect of certification when so many other variables, such as the talent and dedication of the teacher, the support of the family, and available resources and environment, are incapable of control. We are not unmindful of the current controversy regarding the effectiveness of the certification program in producing the quality of teachers every parent would have teach their child. But we are here to scrutinize the constitutional limitations of the Legislature, not its wisdom. Cf. *Braunfeld v Brown, supra,* 608.[33]

We would conclude that the certification require-

gan to which my colleague refers contemplates making certification more difficult to attain, thereby improving the quality of teachers. The fact that such legislation is pending does not support the conclusion that certification requirements are unnecessary to further the states' interest in maintaining quality education for all. Indeed, the opposite conclusion may be drawn, i.e., the state views its interest as so vital that the requirements should be retained and improved upon, not abandoned.

[33] Were we to require the state to offer the exemption requested in this case, it is quite possible that the requested exemptions would result in substantial deregulation of the teaching profession in the private sector, so that the state would be severely hampered in the

ment in the case at bar is an indirect and minimal burden on plaintiffs' free exercise rights and that the interest of the state is of such a high order as to override the interest claiming protection.

V

THE REMAINING ISSUES

We also agree with the treatment of the remaining issues in the opinion for affirmance. We note that the parties have reached an agreement as to the meaning of the other regulatory statutes involved. Because there is no longer a disagreement among the parties as to these points, see *Detroit v Street Electric Ry & Motor Coach Employees Union,* 332 Mich 237, 258; 51 NW2d 228 (1952), app dis 344 US 805 (1952), reh den 344 US 882 (1952),[34]

support of its interest. Testimony at trial indicated that of the 30,000 parochial schools in this country, 12,000 are of plaintiffs' fundamentalist faith and 1,200 new schools are begun each year.

[34] The cases cited by the opinion for reversal for the proposition that issues on appeal do not become moot because an appellee concedes that error occurred in the court below are inapposite to the case at bar. In *United States v W T Grant Co,* 345 US 629; 73 S Ct 894; 97 L Ed 1303 (1953), at issue was the legality of certain conduct alleged to be in violation of the Clayton Act. This issue did not become moot when the defendant voluntarily ceased the conduct because the public interest in having the legality of such practices settled militated against a mootness conclusion. Nor did the discontinuance of the illegal conduct preclude the court's power to grant injunctive relief. The moving party, however, was required to satisfy the court that relief was necessary by establishing cognizable danger of recurrent violation.

In *Young v United States,* 315 US 257; 62 S Ct 510; 86 L Ed 832 (1942), at issue was conduct alleged to be in violation of the Harrison Anti-Narcotic Act, as amended. In the appeal from defendant's conviction, the government confessed error. The government's confession of error in that case, although entitled to great weight, did not preclude independent examination of the question by the Court. "The public interest that a result be reached which promotes a well-ordered society is foremost in every criminal proceeding. . . . [T]he proper administration of the criminal law cannot be left merely to the stipulation of parties." 315 US 259.

Unlike the cases above, this case does not involve the meaning or

further disposition of these issues by this Court is

---

application of a criminal or quasi-criminal statute which by nature, is generally subject to strict construction and cannot be sustained unless its mandates are so clearly expressed that an ordinary person can determine in advance whether his conduct is or is not punishable under the statute. See *People v Silver*, 302 Mich 359; 4 NW2d 687 (1942). At issue in this case is the meaning of certain regulatory statutes and the interpretation of the statutes by the governmental agency charged with the responsibility of enforcing them. At this point, the plaintiffs have no quarrel with the state's interpretation of the statute, and there is no indication that the state intends to enforce the regulations according to any other interpretation. Because the conflict between the parties as to these issues is now resolved, we would be reluctant to create unnecessary precedent which could diminish the current flexibility in this area of the law.

It is a longstanding principle of jurisprudence that a court should avoid ruling on constitutional challenges to the legality of state statutes where such avoidance is possible. "[T]he Court will not pass upon the constitutionality of legislation . . . until it is necessary to do so to preserve the rights of the parties," *Coffman v Breeze Corps, Inc*, 323 US 316, 324-325; 65 S Ct 298; 89 L Ed 264 (1945). Where the parties have reached agreement that their interests are satisfied without the need to resolve a constitutional claim, it is generally unwise for a court to disregard such agreement.

The opinion for reversal criticizes that approach and comments that it leaves standing the decision of the Court of Appeals on those issues. Our colleague would adopt as a controlling construction of the fifteen statutes the agreement of the parties. In the place of avoidance of rulings on constitutional claims, our colleague would thus delegate to the parties the authority to construe acts of the Legislature. Whatever merit there may be to the argument that this Court should rule upon the constitutionality of the curricula, licensing, and reporting requirements of the statutes involved despite the agreement of the parties, in our judgment, there is no merit to the position that the claim of the parties ought to be adopted relative to the constitutionality of statutes, thereby delegating to the parties the authority not only to reverse a decision of the Court of Appeals, but to construe acts of the Legislature and to effectively bind nonparties without the benefit of advocacy.

We intimate no opinion whether the Court of Appeals is correct or incorrect in the resolution of these issues. We intimate no opinion whether the Department of Education, here represented by the Attorney General, reached an appropriate agreement with the plaintiffs on these issues.

The interests of the plaintiffs are obviously furthered by such resolution since the State of Michigan is bound by its agreement. Whether the interests of the State of Michigan or its Department of Education are furthered, and whether the state is bound to treat all similarly situated citizens in accord with such agreement, we decline to decide.

inappropriate.[35] See *Flint v Consumers Power Co,*
290 Mich 305; 287 NW 475 (1939).

We would affirm the decision of the Court of
Appeals.

BRICKLEY, J., concurred with BOYLE, J.

RILEY, J. This case involves the appropriate
construction, constitutional validity, and enforcea-
bility of the private and parochial schools act, 1921
PA 302, MCL 388.551 *et seq.;* MSA 15.1921 *et seq.,*
through the compulsory public education statute,
MCL 380.1561 *et seq.;* MSA 15.41561 *et seq.* Plain-
tiffs successfully challenged the enforcement of
several of the act's provisions on vagueness, free
exercise, Establishment Clause, and substantive
due process grounds. The Court of Appeals re-
versed the trial court's decision and upheld each
provision of the act as applied. In deciding the
vagueness and Establishment Clause challenges,
both courts were required to construe some of the
act's broadly expressed provisions.

A number of issues in this case which were
constitutionally adjudicated may now be resolved
on nonconstitutional grounds by expressly adopt-
ing limiting constructions for several of the act's
broadly expressed regulatory provisions.[1] The re-
maining question concerns the constitutionality of
closing down two independent fundamentalist

[35] The parties would dispose of the curriculum issue on the basis of
this Court's decision in *Snyder v Charlotte Public School Dist,* 421
Mich 517, 539-540; 365 NW2d 151 (1984). While we express no opinion
on the merits of the parties' agreement, we would point out that a
majority of this Court stated in *Durant v State Bd of Ed,* 424 Mich
364; 381 NW2d 662 (1985), that *Snyder* did not establish that public
and parochial schools are required by law to provide a core curricu-
lum. Rather, "*Snyder* stands for the proposition that *if a district
chooses to offer certain courses, it must make them available to all
students in the district.*" *Id.,* 388. (Emphasis supplied.)

[1] I am persuaded that my colleagues have failed to adequately
address these issues by inappropriately dismissing them.

Christian schools, and compelling the children attending those schools to attend the public schools or a nonpublic school against the wishes of their parents, not on the ground that the schools are failing to adequately "educate" these children (and thereby defeating the legitimate public interests underlying the compulsory public education law), but because of each school's religiously based refusal to comply with the statutory teacher certification requirement, which requires *all* denominational and parochial schools to employ *only* teachers who hold a certificate such as would qualify them to teach in the public schools.[2]

The record abundantly supports the trial court's findings that plaintiffs' refusal to comply with the certification requirement is based upon sincerely held religious beliefs and that the certification requirement affirmatively interferes with the free exercise of those beliefs. Thus, plaintiffs' religious practice with regard to the employment of teachers is protected by the First Amendment, and the statutory regulation, as applied, is constitutionally suspect. The crucial question, therefore, concerns whether the state has established that enforcing the certification requirement is essential to the fulfillment of a compelling governmental interest —here, the objectives of the compulsory education law. In this regard, it was incumbent upon the state to show, first, that exempting plaintiffs from the certification requirement would unduly impair its interest in compulsory education and, second, that enforcing the certification requirement is the

---

[2] MCL 388.553; MSA 15.1923. See 1979 AC, R 390.1101 *et seq.;* 1981 AACS, R 390.1101 *et seq.* (the Teacher Certification Code). The state conceded at the outset of trial that plaintiffs' children were in no way receiving an "inadequate" education. See n 53. The state has not asserted that plaintiffs' teachers are incompetent, academically or otherwise, but only that they have not all complied with the administrative requirements to obtain the requisite certificates to teach in the public schools.

least intrusive means (upon plaintiffs' free exercise rights) by which to accomplish its objective.

The state has never asserted, in this case, that exempting plaintiffs from the state teacher certification regulation will detract in any way from its interest in furthering the objectives of compulsory education. Furthermore, it conceded that plaintiffs were in no way failing to adequately educate their children, even though they were not employing only teachers who held certificates to teach in the public schools. See n 53. Plaintiffs, on the other hand, although not required to do so, have presented persuasive empirical evidence that an exemption would not harm the state's interest. In this regard, the record contains the documented academic achievement records of the children, objectively measured by their performance on standardized achievement tests. Additionally, it reflects the existence of numerous empirical studies, through the testimony of nationally recognized education experts, conducted in the overwhelming majority of states which do not impose the regulation that all children be educated only by state certified teachers to implement their compulsory education laws (no more than five other states currently impose such a regulation),[3] which support the factual conclusion that religious schools that do not employ only state certified teachers pose no threat to the state's interest in education. It is uncontested, on the record in this case, that no correlative relationship in fact exists, in religious schools, between state teacher certification and student learning or teacher competence.

My colleagues, per the opinion of Chief Justice

[3] Those states are: Hawaii, Idaho, South Dakota, Washington and Iowa. See n 58. At the time of this writing, the Iowa Legislature, upon the recommendation of a special Governor's task force report, is considering abrogating that state's certification requirement. See n 59.

WILLIAMS, would uphold the enforceability of the legislation as applied, as did the Court of Appeals, by finding that it is *reasonably related* to furthering the state's interest in education.[4] Justice BOYLE, concurring in that result, applies her version of the "balancing test" appropriate in this case, of which the ultimate characteristic is to relieve the state of its burden to justify the enforcement of legislation which affirmatively interferes with fundamental First and Fourteenth Amendment rights.[5] Justice BOYLE would uphold

---

[4] In reaching its decision in this case, reversing the trial court's ruling, the Court of Appeals also applied that standard of review. The Court of Appeals reasoned:

Plaintiffs have urged that there is no compelling state interest in any of the specific state requirements involved in this case but this argument misplaces the emphasis. The issue is not whether there is a compelling state interest in any individual regulation but whether the individual regulations are *reasonable means to give effect to a broader compelling state interest*—in this case the provision of an education to all children, for the reasons stated herein, we believe the regulations are a *reasonable* exercise of state authority in the field of education. [Emphasis added. *Sheridan Church v Dep't of Ed,* 132 Mich App 1, 22; 348 NW2d 263 (1984).]

[5] I disagree with Justice BOYLE's assertion that the United States Supreme Court has not addressed the burden of proof imposed upon the state in order to justify the enforcement of legislation which infringes upon individuals' rights afforded by the Free Exercise Clause. See *ante,* p 492 and n 10. The Supreme Court's decisions construing the Free Exercise Clause, including *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972), have consistently held that it is the state's burden of proof in this regard to establish that granting the appropriate remedy, exemption, will unduly interfere with the fulfillment of a compelling governmental interest. Indeed, Justice BOYLE's opinion acknowledges that " '[t]he government must show that granting the requested exemption will do substantial harm to th[e] [state's] interest . . . .' " (Citation omitted.) *Ante,* p 489.

Justice BOYLE's opinion for affirmance, like Chief Justice WILLIAMS' opinion, does not impose that burden of proof upon the state in this case. Her opinion does not conclude, either by reference to the extensive record or otherwise, that exempting plaintiffs from the certification requirement will result in any harm whatsoever to the state's interest in compulsory education. Instead, Justice BOYLE's opinion concludes that plaintiffs have not established "an alternative

the challenged legislation, as applied, because
"logic and experience indicate that it furthers [the
state's interest in education]," essentially applying,
as did the Court of Appeals and Chief Justice
WILLIAMS, a rational-basis standard of review. I
am convinced that my colleagues, with all respect,
have not applied the constitutionally mandated
standard of review, that they have substantially
ignored the factual record, and that they have
inappropriately disposed of several of the other
constitutional questions presented with regard to
the private and parochial schools act.

The record in this case does not support the
factual conclusion that enforcing the teacher certi-
fication provision of the act, as applied, is essential
to the state's interest in compulsory education.
Indeed, the state, upon which the burden to justify
enforcing that legislation unquestionably rests, has
failed to establish any substantial relationship
between the enforcement of that regulation and
the governmental interest in compulsory educa-
tion. Unless, and until, the state can show other-
wise, I would reverse the decision of the Court of
Appeals and reinstate the decision of the trial
court enjoining the enforcement of that statute as
applied. Furthermore, I would expressly adopt
limiting constructions for several of the act's other
provisions and uphold their constitutional validity
as construed, and I would reverse the decision of
the Court of Appeals to the extent that it is
inconsistent with those constructions.

means by which the state can ensure . . . its interest in providing
education to its citizenry . . . ." *Ante,* p 513.

I am persuaded that Justice BOYLE's opinion effectively shifts the
state's burden to justify the enforcement of the regulation challenged
in the present case upon the plaintiffs to justify its nonenforcement. I
am equally persuaded that her opinion's reference to *Yoder, supra,* to
support that approach, is entirely misplaced. See part VI(B).

I

An understanding of the constructional and constitutional issues involved in this case requires a brief discussion of the operative provisions of the private and parochial schools act of 1921.

Section 1 of the act, after vesting supervision of "all the private, *denominational* and *parochial* schools of this state" to the Superintendent of Public Instruction, declares:

> It is the intent of this act that . . . the courses of study [in such schools], and the qualifications of the teachers thereof shall be of the same standard as provided by the general school laws of the state.

Section 2 of the act defines "private, denominational or parochial school," within the meaning of the act, as "any school other than a public school giving instruction to children below the age of 16 years, in the *first 8* grades as provided for the public schools of the state." (Emphasis added.)

Section 3 of the act expressly imposes the teacher certification requirement:

> No person shall teach or give instruction in any of the regular or elementary grade studies in any private, denominational or parochial school within this state who does not hold a certificate such as would qualify him or her to teach in like grades of the public schools of the state.

Section 4 of the act authorizes the Superintendent of Public Instruction to enforce the provisions of the act and sets forth enforcement procedures. If a violation of the act is established, after an administrative hearing, the Superintendent of Public Instruction is to "order [compliance] with the requirements of th[e] act found to have been

violated . . . ." If such an order is not obeyed within sixty days, the "superintendent . . . may close [the] school and prohibit . . . [the] operating or maintaining [of the] school . . . until [the] order . . . has been complied with." The children attending a school which has refused to comply with the requirements of the act

> shall be compelled to attend the public schools or approved [nonpublic] school under the provisions of the compulsory education act . . . of 1905, as amended. And it shall be the duty of the persons having charge of the enforcement of the said compulsory education act . . . to compel the attendance of the children . . . at the public schools or approved private, denominational or parochial school.[6]

Finally, § 5 of the act authorizes the Superintendent of Public Instruction "by himself, his assistants, or any duly authorized agent," to "at any time . . . investigate and examine into the conditions of any school operating under this act," and imposes a duty upon such schools to "submit for examination its sanitary condition, the records of enrollment of pupils, *its courses of studies as set forth in section 1 . . . and the qualifications of its teachers.*" (Emphasis added.) Any refusal to comply with the provisions of § 5 "shall be considered sufficient cause to suspend the operation of [the] school . . . ."

II

Plaintiffs, Sheridan Road Baptist Church, First Baptist Church of Bridgeport, their pastors, par-

---

[6] The compulsory education act of 1905, has survived relatively unchanged and is currently incorporated in part 24 of the School Code. MCL 380.1561-380.1599; MSA 15.41561-15.41599.

ents of children enrolled in the churches' schools, and members of the faculties, commenced this action in the Ingham Circuit Court after the Department of Education and the Superintendent of Public Instruction sought suspension of the operation of the schools operated by each church for failure to comply with the reporting requirements of the act.[7]

Plaintiffs sought injunctive and declaratory relief, challenging the constitutional validity and application of several of the act's provisions, and regulations promulgated thereunder, as violative of the Free Exercise and Establishment Clauses of the First Amendment, the Ninth Amendment, the Due Process Clause of the Fourteenth Amendment,[8] and art 1, § 4, and art 8, § 1, of the Michigan Constitution. Plaintiffs constitutionally challenged provisions of the act which attempt to impose curriculum requirements, licensing (or "approval") requirements, teacher certification requirements, and reporting requirements, as applied, to regulate the existence and operation of plaintiffs' independent fundamentalist Christian schools.

The state counterclaimed, seeking an injunction to require plaintiffs to comply with the regulations, and a declaration that 1921 PA 302 is constitutional on its face and as applied to plaintiffs.

After a six-day trial, the court issued a memorandum decision in which, having considered all of the testimony, it made specific findings as to: the

[7] Sheridan Road Baptist Church operates the Sheridan Road Christian School; First Baptist Church of Bridgeport operates the Bridgeport Baptist Academy. Procedures were instituted to suspend the operation of each school and to determine compliance with the provisions of the act. Plaintiffs' schools were the only schools against which such procedures were instituted.

[8] Plaintiffs challenged provisions of the act as unconstitutionally vague and as violative of the "privacy" rights of parents to direct the academic, social, and religious education of their children.

plaintiffs' religious beliefs, practices, and minis-
tries; the nature of Michigan's interest in demand-
ing certification of the teachers in church schools;
the correlative relationship between teacher certi-
fication, teacher "competence," and student learn-
ing; the vagueness of the curriculum requirement
and its inability, as construed, to ensure uniform
"quality" in education; and the inappropriateness
of vesting authority over religious school curricula
in local public school officials operating without
standards or guidelines.[9]

The trial court upheld plaintiffs' constitutional
challenges and enjoined application and enforce-

[9] The trial court found that, as currently implemented, § 1 of the
act requires the curricula of nonpublic schools to be "comparable" to
public schools in *the same district,* and that local school district
officials are charged with evaluating nonpublic schools. The court
found, further, that guidelines for local school district officials in
evaluating nonpublic schools do not exist.

The Superintendent of the Bridgeport Spalding Community School
District, within which plaintiffs' schools are located, testified that it
was within his power to determine whether a nonpublic school was
"comparable" and that in his opinion nonpublic schools must teach
"appropriate" courses of the same quality as those taught in the
public schools within the district.

The superintendent also admitted concern with the loss of $2,000 in
state aid for every student who leaves the public school and enrolls in
area nonpublic schools when plaintiffs introduced a newsletter enti-
tled *The Spotlight* which is sent to "key communicators in the school
district" by the superintendent. The superintendent read the follow-
ing excerpts from that publication into evidence:

At the present time, we in the school district have estab-
lished some basic principles we hope will assist us in getting by
during this economic depression.

* * *

Number 4, to prevent loss of students to nonpublic
schools . . . . We lose $2,000 for every student who leaves our
school district."

The trial court found that local school district officials are ill-
prepared to implement the broad provisions of the act and the
corresponding provisions of the compulsory attendance statute with-
out guidelines, and expressed concern that they have a vested interest
in maintaining enrollment in the public schools. Circuit court opinion,
part v, issued December 29, 1982.

ment of the curricula and teacher certification requirements as applied to plaintiffs.[10]

The state filed a claim of appeal, and the Court of Appeals reversed, upholding the constitutionality of 1921 PA 302, as applied, because it found that the infringement of plaintiffs' free exercise rights was justified by each challenged regulation's *reasonable* relationship to the state's interest in education.[11]

This Court granted plaintiffs' application for leave to appeal to consider the constitutional enforceability of the private and parochial schools act, as applied to plaintiffs, with respect to each of plaintiffs' constitutional challenges, and to review the Court of Appeals decision which reversed the decision of the trial court with regard to each challenge. 422 Mich 857 (1985).

III

It now appears that a number of the constitutional issues which were adjudicated by the Court of Appeals and the trial court may be resolved on nonconstitutional grounds if this Court adopts a limited construction of the statutory curricula and licensing ("approval") requirements.[12]

The state has advanced a limited construction of the provisions imposing curricula and licensing

[10] The trial court held § 1 of the act, which requires courses of study to be of "the same standard as provided by the general school laws in the state," to be unconstitutional as applied to plaintiffs; § 3 of the act, which requires teachers employed in religious schools, without exceptions, to hold a Michigan teacher's certificate, to be unconstitutional as applied to plaintiffs; and that the information gained from plaintiffs pursuant to § 5 of the act may not be used for purposes of approval of plaintiffs' schools.

[11] *Sheridan Church, supra,* 22.

[12] My colleagues have inappropriately treated plaintiffs' position in this regard as a dismissal of their appeal from the Court of Appeals decision.

requirements upon *all* nonpublic schools, which, apparently, it did not advocate in the Court of Appeals or in the trial court.[13] Plaintiffs, responding to these proposals, have stated that adopting this limiting construction would remove plaintiffs' constitutional objections to those two aspects of the state's regulatory scheme. Likewise, plaintiffs would no longer object to the reporting requirement as it relates to those aspects of the scheme.

Thus, if this Court adopts the limited construction now advanced with respect to the statutory curriculum, licensing, and reporting requirements, the only remaining question requiring constitutional adjudication concerns the plaintiffs' challenges to the teacher certification requirement. I would adopt those limiting constructions to avoid constitutional adjudication with regard to those statutory requirements. A statute "ought not be construed to violate the Constitution if any other possible construction remains available." *NLRB v Catholic Bishop of Chicago,* 440 US 490, 500; 99 S Ct 1313; 59 L Ed 2d 533 (1979).[14]

The intent of the private and parochial schools act to directly regulate religious schools is clearly expressed.[15] While the reasonable regulation of all

---

[13] The limiting constructions now advanced by the state conflict with the constructions given to those provisions by both the Court of Appeals and the trial court.

[14] See *Ashwander v Tennessee Valley Authority,* 297 US 288, 348; 56 S Ct 466; 80 L Ed 688 (1936) (Brandeis, J., concurring); *Snyder v Charlotte Public School Dist,* 421 Mich 517; 365 NW2d 151 (1984). But cf. *Heckler v Mathews,* 465 US 728, 741; 104 S Ct 1387; 79 L Ed 2d 646 (1984) (seeking alternative construction does not "license a court to usurp the policymaking and legislative functions").

[15] The act expressly refers to "denominational and parochial schools." Additionally, it should be emphasized that the overwhelming majority of nonpublic schools are in fact religiously affiliated. It has recently been noted, for example, that "[i]n the 1980-81 school year, 84% of private schoolchildren (including those in kindergarten) attended church-affiliated schools." Note, *Tuition tax deductions and credits in light of* Mueller v Allen, 31 Wayne L R 157, n 3 (1984)

nonpublic schools is permissible within the state's police power, such regulation is not beyond the limitations of the Bill of Rights. Set against the governing principles of neutrality and accommodation inherent in the First Amendment's protection of religious freedom, the facts of the present case give rise to serious constitutional questions concerning the extent to which the government may regulate "nonpublic" education, without consideration for religious exemptions and the individual freedoms of parents and their children. With regard to plaintiffs' free exercise claims, the constitutionally recognized right of parents to direct the religious and intellectual education of their children is directly implicated. See *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925). See also *Project, Education and the law: State interests and individual rights,* 74 Mich L R 1373 (1976). Furthermore, the intrusive nature of the enforcement provisions of the act, §§ 4 and 5, elevates the need for careful consideration of plaintiffs' free exercise and due process challenges.

Additionally, the act's broadly expressed continuous regulatory authority may give rise to serious constitutional questions under the Establishment Clause. See *Lemon v Kurtzman,* 403 US 602, 616; 91 S Ct 2105; 29 L Ed 2d 745 (1971).

Nevertheless, I am persuaded that a limited construction may be given to the curricula, licensing, and reporting requirements, which, within the facts of the present case, would be consistent with the First and Fourteenth Amendments, and would make it unnecessary to apply the constitutionally mandated heightened standard of review to deter-

(citing National Center for Education Statistics, US Dep't of Education, Digest of Education Statistics, 49 (1982).

mine the enforceability of those statutory provisions.

## A

The act does not define curricula requirements per se, other than its reference in the general intent sentence of § 1 that "the courses of study . . . shall be of the same standard as provided by the general school laws of the state." In addition to the inherent vagueness of "the same standard," the numerous constructions that could be given to the phrase "provided by the general school laws of the state" render the act's attempt to impose "required" courses of study cryptic.[16]

Plaintiffs' attempt to ascertain the meaning of the "curriculum requirement," to which it must comply, was of no avail at trial; the examination of state officials and the production of documentary evidence resulted in contradictory and confusing evidence.[17] The trial court ultimately held this

---

[16] At least three possible constructions could be given to the phrase "provided by the general school laws of the state": courses mandated in the general school laws expressly for nonpublic schools, which would include only Civics and Government (MCL 380.1166; MSA 15.41166); courses provided for in the general school laws not expressly limited to public schools, which would include sex education (MCL 380.1501; MSA 15.41501), reproductive health (MCL 380.1506; MSA 15.41506), and other courses that plaintiffs object to on religious grounds; the reference to courses of study in the compulsory education statute (MCL 380.1561; MSA 15.41561), which is not directly applicable to schools, but is a truancy law enforceable against parents, and requires courses "comparable" to those offered in the public schools of the particular school district in which the nonpublic school is located.

[17] For example, a consultant from the Department of Education testified that it means the same "courses," but that "there are questions concerning the meaning of the act." The school superintendent testified that it means "quality," not "subjects." A Department of Education official testified that it means "basic core subjects," but that only two are required, "Government and civics," but that any course that a consensus in Michigan deemed "basic" would have to be taught. The Associate Superintendent for Elementary and Secondary

statutory requirement to be unconstitutional on its face.[18]

According to a Department of Education publication which was produced and admitted at trial, the curricula requirement imposed by § 1 of the act requires that the courses of study provided by nonpublic schools "*be the same or equivalent to* that provided by the public school district in which the said nonpublic school is located geographically." (Emphasis added.)[19] That construction seems consistent with the compulsory education statutes' exception to mandatory *public* school attendance for:

> (a) A child who is attending regularly and is being taught in a state approved nonpublic school, which teaches subjects comparable to those taught in the public schools . . . , as determined by the course of study for the public schools of the district within which the nonpublic school is located. [MCL 380.1561(3)(a); MSA 15.41561(3)(a).][20]

Education testified that it means only Civics and Government and that a nonpublic school need not teach mathematics.

[18] The trial court found § 1 of the act to be violative of the Establishment Clause, because it causes excessive government entanglement and, as construed, does not further the state's interest in education. The court's holding was premised, at least partially, upon the factual finding that local public school officials are charged with evaluating and enforcing the curricula requirements without guidelines. See n 9.

[19] Department of Education publication, *Statutory Provisions for the Establishment and Operation of Elementary and Secondary Non-Public Schools,* p 12. That publication states, additionally, that "[s]pecific subject contents, as prescribed by the legislature in the General School Law, [must] be included in the basis [sic] course of study of the nonpublic school."

[20] Other exceptions to mandatory public school attendance (MCL 380.1561[3][b]-[e]; MSA 15.41561[3][b]-[e]) are:

(b) a child who is employed as a page or messenger in the Legislature during the period of employment;

(c) a child under nine years old who does not reside within two and one-half miles of a public school;

(d) a child from the age of twelve to fourteen while in attendance at *Confirmation* classes;

Citing this provision of the compulsory education statute, the Court of Appeals held that nonpublic schools, "[i]n order to win state approval," must offer "courses 'comparable' to those offered by the public schools in the district within which the nonpublic school is located." 132 Mich App 1, 25; 348 NW2d 263 (1984). As construed by the Court of Appeals, the curricula that a nonpublic school is statutorily required to adopt depends upon the geographical location of the school and would include courses other than "core curriculum courses" and courses religiously objectionable to plaintiffs.[21]

However, the state now rejects the Court of Appeals construction and asserts a more limited construction of the statutory curricula regulation, citing this Court's decision in *Snyder v Charlotte Public School Dist,* 421 Mich 517; 365 NW2d 151 (1984), in which this Court referred to the curricula requirement. This limited construction, which plaintiffs have stated would remove their constitutional objections,[22] would not depend upon geo-

(e) a child enrolled in the public schools attending *religious instruction* classes for not more than two class hours per week, upon written request of the parent.

[21] Statutorily prescribed courses include: critical health problems education (MCL 388.382 *et seq.;* MSA 15.1958(2) *et seq.*); communicable diseases (MCL 380.1169; MSA 15.41169); physiology and hygiene (MCL 380.1170; MSA 15.41170); humane treatment of animals (MCL 380.1171; MSA 15.41171); instruction in the pluralistic, multiracial, and multiethnic nature of society (MCL 380.1173; MSA 15.41173); instruction in the culture of ethnic, religious, and racial minorities, and the contributions of women (MCL 380.1174; MSA 15.41174); sex education (MCL 380.1501; MSA 15.41501); health and physical education (MCL 380.1502; MSA 15.41502); and reproductive health instruction (MCL 380.1506; MSA 15.41506).

[22] In addition to challenging the curricula requirements imposed by § 1 of the act as violative of the religious freedom guarantees of the First Amendment and parental privacy protections of the Fourteenth, plaintiffs challenge that statutory regulation as unconstitutionally vague. See *State v Newstrom,* 371 NW2d 525 (Minn, 1985). See also *Keyishian v Bd of Regents,* 385 US 589; 87 S Ct 675; 17 L Ed 2d 629 (1967).

graphical location and would require nonpublic schools to provide a " 'core curriculum' . . . such as basic reading, mathematics, writing, English, etc." *Id.,* 540.[23] Plaintiffs maintain an extensive "core curriculum" of required courses, and the state agrees that plaintiffs are not in violation of the curriculum requirement.[24]

Further, the state affirmatively asserts that the private and parochial schools act should not be construed as authorizing state officials to "inject themselves into the operation of nonpublic schools," or to "examine content of courses," or to engage in "monitoring" the churches' schools, or to "evaluate curriculum . . ., teaching techniques and methods, textbooks, or testing procedures."[25]

### B

With regard to the licensing/approval issue, the state now asserts that Michigan law "does not provide for or require the approval or licensing of any school"; it merely confers the authority to " 'disapprove' for noncompliance with specific re-

Plaintiffs now agree, however, that should this Court "adopt the construction of the curriculum requirement now offered by the State (in the face of the 'comparability' requirement of 1976 PA 451, Section 1561), the vagueness challenge of plaintiffs is dispelled."

[23] Additionally, pursuant to MCL 380.1166; MSA 15.41166, which is applicable to both public and nonpublic schools, "courses of instruction [are required] in the constitution of the United States, . . . constitution of Michigan, . . . government of the United States [including history thereof], Michigan, and its political subdivisions, [and] [a] high school . . . course . . . in civics . . . [stressing] the rights and responsibilities of citizens." MCL 380.1166(1), (2); MSA 15.41166(1), (2).

[24] The state conceded at the outset of the trial in this case that plaintiffs are in compliance with the curricula regulations. See n 53.

[25] As the trial court found, there are no significant guidelines restricting the supervisory authority granted to local public school district officials to evaluate local nonpublic schools. The local official charged with evaluating plaintiffs' schools testified that it was within his authority to evaluate textbooks and teaching techniques to determine "comparability."

quirements." The state urges that although 1921
PA 302, § 4, and the compulsory education stat-
ute[26]     refer     to     " 'approved'     nonpublic
schools . . . this simply means a school which has
not been 'disapproved,' " and, thus, no "prior re-
straint" is imposed to the beginning or continuing
of plaintiffs' teaching ministry.

Plaintiffs agree that, if adopted, this construc-
tion would remove their constitutional objections
to the "licensing" requirement which "has been of
deepest concern [to them] since . . . they are reli-
giously disabled to seek a governmental permit to
initiate a ministry."

C

Adopting the proposed limited construction of
the curricula and "approved" requirements would
also remove plaintiffs' objection to the reporting
requirements imposed under § 5 of the act as they
relate to those aspects of the regulatory scheme.
Plaintiffs have never objected to the reporting
requirements imposed by § 1578 of the School
Code, MCL 380.1578; MSA 15.41578, which does
not require information for purposes of enforcing
regulations religiously objectionable to plaintiffs.[27]

---

[26] MCL 380.1561(3)(a); MSA 15.41561(3)(a). See text accompanying n 20.

[27] Section 1578 requires nonpublic schools to report the following data, at the beginning of the school year:

> (a) the name and age of each child who is enrolled at the school.
> (b) The number or name of the school district and the city or township and county in which the parent, guardian, or person in parental relation resides.
> (c) The name and address of the parent, guardian, or other person in parental relation.
> (d) The name and age of each child enrolled in the school who is not in regular attendance. [MCL 380.1578; MSA 15.41578.]

D

I would expressly adopt the limited constructions of those provisions of the act and thereby
reverse and modify the decision of the Court of
Appeals to the extent that the constructions given
to those provisions by that Court are inconsistent
with the limited constructions here adopted. My
colleagues' treatment, or, more precisely, nontreatment of these issues does not appropriately resolve
the constitutional questions presented. Plaintiffs
have not dismissed their constitutional challenges
to the enforcement of those provisions, as construed in the binding decision of the Court of
Appeals. That the state has modified its position
with respect to the appropriate statutory construction of the requirements imposed upon all nonpublic schools and its authority to enforce those
requirements, does not, in itself, remove plaintiffs'
constitutional objections. Statutory construction is
within the province of the courts, and the constructions now urged by the state, which conflict
with the constructions adopted by the binding
decision of the Court of Appeals, are without legal
effect. Plaintiffs have not agreed to dismiss, by
stipulation of the parties, the constitutional questions presented with regard to those provisions.
While stipulations as to questions of fact are binding upon the parties, stipulations concerning questions of law are inoperative, and without legal
effect. See *People v Levisen,* 404 Ill 574; 90 NE2d
213 (1950).

The cases cited in Justice BOYLE's opinion do not
support my colleagues' avoidance of these issues.
In *Detroit v Street Ry Employees Union,* 332 Mich
237, 258; 51 NW2d 228 (1952), the issue referred to
"was not decided by the lower court." In *Flint v
Consumers Power Co,* 290 Mich 305, 308; 287 NW

475 (1939), no actual controversy existed at the time the declaratory judgment action was instituted in that case.

This Court may not appropriately dispose of these issues by deciding that no "case or controversy" exists, or that the issues have been mooted. The case or controversy requirement of the federal constitution, which prohibits the federal courts from issuing advisory opinions, is completely inapplicable in this situation. An actual controversy does exist, with actual parties, and, indeed, it has been decided by both the trial court and the Court of Appeals. The inapplicability of the mootness doctrine is also apparent. Issues on appeal do not become moot, and therefore not reviewable, because the appellee changes its position and thereby concedes that the decision being reviewed was incorrect to that extent. See, e.g., *United States v W T Grant Co,* 345 US 629; 73 S Ct 894; 97 L Ed 1303 (1953); *Young v United States,* 315 US 257; 62 S Ct 510; 86 L Ed 832 (1942). The effect of my colleagues' nontreatment of these issues is to allow the Court of Appeals constructions of these provisions of the act to stand, effectively affirming them, and to ignore the substantial constitutional questions presented.

Justice BOYLE articulates her disapproval of adopting the limiting constructions now advanced by the state to uphold the constitutional validity of these statutes and avoid reviewing the decision of the Court of Appeals, stating that that position has "no merit." *Ante,* p 515, n 34. However, contrary to Justice BOYLE's assertions, my point is that the appropriate resolution of these issues requires either (1) adopting limiting constructions of these statutes to uphold their constitutional validity and make it unnecessary to review the decision of the Court of Appeals, or (2) reviewing

the substantial vagueness, Establishment Clause, free exercise, and other issues decided by the Court of Appeals as it construed these statutes. Because my colleagues are not inclined to adopt any limiting constructions of these statutes, I would suggest that the only other appropriate disposition would require reviewing the Court of Appeals decision, which is binding upon these parties and all others regardless of the so-called "agreement" of the parties, in its entirety.

The error in Justice BOYLE's assertion that "the State of Michigan is bound by its [so-called] agreement" (*ante,* p 515, n 34), is exemplified by her own inapposite criticism that I would "delegate to the parties the authority to construe acts of the Legislature," and "the authority . . . to reverse a decision of the Court of Appeals." *Ante,* p 515, n 34.

IV

The remaining constitutional question concerns the enforceability, consistent with the First and Fourteenth Amendments of the United States Constitution, of the teacher certification statute, MCL 388.553; MSA 15.1923, and regulations promulgated thereunder, 1979 AC, R 390.1101 *et seq.;* 1981 AACS, R 390.1101 *et seq.* (the Teacher Certification Code), as applied.

The state teacher certification requirement is imposed by § 3 of the 1921 act. It requires all parochial and denominational schools to employ *only* teachers who "hold a certificate such as would qualify him or her to teach in . . . the public schools of the state." The administrative requirements for securing state certification are promulgated by the State Board of Education, and include the completion of a program of study at a

state-approved teacher training institution. Upon
the recommendation of such an institution, a pro-
visional certificate is issued. To obtain a continu-
ing certificate, the candidate must complete eight-
een semester hours of additional study, which is
not restricted to any particular subject matter but
which must be approved by the training institu-
tion. See, generally, 1979 AC, R 390.1101 *et seq.;*
1981 AACS, R 390.1101 *et seq.,* for additional
specific regulations regarding teacher certification.

The enforcement provisions of the act, §§ 4 and
5, authorize the state to close any parochial or
denominational school which is in violation of § 3
(i.e., does not employ *only* teachers who hold a
valid state certificate).

Plaintiffs challenge the enforcement of the
teacher certification statute as an unnecessary
interference with their First Amendment rights to
freely exercise their religion. Additionally, plaintiff
parents assert their fundamental rights, as par-
ents, to direct the intellectual and religious educa-
tion of their children, and the rights of their
children to receive that direction without unneces-
sary interference by the state. This "fundamental
right" has been recognized independent of the
First Amendment, as protected under the "per-
sonal" substantive due process rights inherent in
the liberty protections of the Fourteenth Amend-
ment. See *Pierce, supra; Prince v Massachusetts,*
321 US 158; 64 S Ct 438; 88 L Ed 645 (1944);
*Farrington v Tokushige,* 273 US 284; 47 S Ct 406;
71 L Ed 646 (1927); *Meyer v Nebraska,* 262 US
390; 43 S Ct 625; 67 L Ed 1042 (1923). See also
*Project, education and the law: State interests and
individual rights, supra.* The fundamental liberty
right recognized in those cases has been reaffirmed
by the Supreme Court, moreover, in several recent
decisions in which it has cited those earlier deci-

sions with approval. See *Yoder, supra,* 233. See also *Moore v East Cleveland,* 431 US 494; 97 S Ct 1932; 52 L Ed 2d 531 (1977); *Runyon v McCrary,* 427 US 160, 178, n 15; 96 S Ct 2586; 49 L Ed 2d 415 (1976); *Roe v Wade,* 410 US 113, 152-153; 93 S Ct 705; 35 L Ed 2d 147 (1973).[28]

In *Pierce, supra,* the Court held unconstitutional an Oregon compulsory education act which required public school attendance with limited exceptions not including private school attendance.[29] The Court said:

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers *only.* The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations. [Emphasis added. *Id.,* 535.][30]

[28] See also *Norwood v Harrison,* 413 US 455, 461; 93 S Ct 2804; 37 L Ed 2d 723 (1973) ("a State's role in the education of its citizens must yield to the right of parents to provide an equivalent education for their children in a privately operated school of the parents' choice"); *Committee for Public Ed & Religious Liberty v Nyquist,* 413 US 756, 788; 93 S Ct 2955; 37 L Ed 2d 948 (1973) ("a state law interfering with a parent's right to have his child educated in a sectarian school would run afoul of the Free Exercise Clause").

[29] The Oregon Compulsory Education Act, adopted in 1922, provided exemptions "for children who are not normal, or who have completed the eighth grade, or who reside at considerable distances from any public school, or whose parents or guardians hold special permits from the County Superintendent." *Pierce, supra,* 530-531.

[30] *Pierce* was decided before the religious freedom guarantees of the First Amendment were held applicable to the states through the Fourteenth Amendment in *Cantwell v Connecticut,* 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940), and *Everson v Ewing Twp Bd of Ed,* 330 US 1; 67 S Ct 504; 91 L Ed 711 (1947). The constitutional analysis in *Pierce* was grounded upon the "substantive" due process rights of parents with respect to the fundamental freedom of controlling the education and socialization of their children.

Such a right was recognized at common law. See, e.g., *Gordon v Los Angeles Bd of Ed,* 78 Cal App 2d 464, 480; 178 P2d 488 (1947); *School*

In *Meyer, supra,* the Court held unconstitutional state legislation which prohibited "the teaching in school of any subject except in English," and "the teaching of any other language until the pupil has attained and successfully passed the eighth grade." *Id.,* 400. In finding that legislation to be violative of the Fourteenth Amendment, as applied, the Court noted that the education systems envisioned in Plato's "Ideal Commonwealth," and by the ancient Spartans, would be inconsistent with the nature of our constitutional democracy:

> For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide: "That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child, nor any child his parent. . . . The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be." In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State

*Bd Dist No 18 v Thompson,* 24 Okla 1, 4; 103 P 578 (1909); *Rulison v Post,* 79 Ill 567, 573 (1875). See also *People v Levisen, supra,* 577.

That parents should have the prior right, and primary role, in directing the education of their children was endorsed by the United Nations General Assembly in *The Universal Declaration of Human Rights,* GA Res 217, art 26 (1948) (cited in *Project, Education and the law: State interests and individual rights,* 74 Mich L R 1373, 1389, n 83 [1976]).

without doing violence to both letter and spirit of the Constitution. [*Id.,* 401-402.]

In *Bartels v Iowa,* 262 US 404; 43 S Ct 628; 67 L Ed 1047 (1923), the Court invalidated similar legislation which had been enacted in Iowa and Ohio. See also *Farrington, supra,* in which the Court invalidated, as violative of the Fourteenth Amendment, an Hawaii statute which interfered with the educational freedom of parents and their children.

In *Yoder, supra,* 233, the Court said that the "additional obligations" referred to in *Pierce* "must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship," and stated that

> *Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children.

In *Yoder,* the Court emphasized that this parental interest is particularly compelling combined with a free exercise claim. *Id.*

Because plaintiffs' challenge to the enforcement of the certification requirement is asserted within the context of the religious freedom guarantees of the First Amendment, independent consideration of their parental rights afforded by the Fourteenth Amendment would be unnecessary. Because I conclude that plaintiffs have established their burden of proof with respect to their free exercise claim, their parental privacy challenge may be considered simultaneously.[31]

Finally, plaintiffs challenge the certification reg-

[31] Consideration of the nature and scope of the unenumerated, though constitutionally recognized, fundamental "substantive" rights embodied in the Due Process Clause of the Fourteenth Amendment, and their application to determine the enforceability of the state legislation challenged in the present case, would require independent analysis. Because plaintiffs have established that the legislation in question affirmatively regulates the exercise of their individual rights

ulation as violative of the Establishment Clause, asserting that it creates excessive entanglements between government and religious schools.

V

Consideration of plaintiffs' free exercise challenge requires, first, determining the applicable standard of review. The United States Supreme Court, in several recent decisions, has considered the standard of review applicable to state legislation which interferes with individuals' rights to freely exercise their religious beliefs. See, e.g., *United States v Lee,* 455 US 252; 102 S Ct 1051; 71 L Ed 2d 127 (1982); *Thomas v Review Bd of Indiana Employment Security Div,* 450 US 707; 101 S Ct 1425; 67 L Ed 2d 624 (1981); *Yoder, supra; Sherbert v Verner,* 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963).[32] While the Court has not enunciated the applicable standard in identical terms, it has become increasingly clear that such legislation requires strict judicial consideration.

In *Lee, supra,* the Court said that "[t]he state may justify a limitation on religious liberty [only] by showing that it is essential to accomplish an overriding governmental interest." Inherent in determining whether the limitation is "essential" to the governmental interest, is consideration of whether accommodation by the state would "un-

expressly afforded by the First Amendment, such independent analysis is unnecessary. It may be presumed, in light of the First Amendment's historical significance and the importance attached to the judiciary's obligation to safeguard the individual rights expressly protected therein, that no stricter standard of review would be mandated.

[32] See also *Bob Jones Univ v United States,* 461 US 574; 103 S Ct 2017; 76 L Ed 2d 157 (1983); *Gillette v United States,* 401 US 437; 91 S Ct 828; 28 L Ed 2d 168 (1971); *West Virginia Bd of Ed v Barnette,* 319 US 624; 63 S Ct 1178; 87 L Ed 1628 (1943); *Murdock v Pennsylvania,* 319 US 105; 63 S Ct 870; 87 L Ed 1292 (1943); *Cantwell v Connecticut,* 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940).

duly interfere with fulfillment of th[at] governmental interest." *Id.,* 257-259.

Similarly, the Court, in *Thomas, supra,* 718, said that "[t]he state may justify an inroad on religious liberty [only] by showing that it is the least restrictive means of achieving some compelling state interest." See also *Sherbert, supra,* 406-408. In *Sherbert,* 406, the Court said "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." Referring to the nature of such a "compelling state interest," the *Thomas* Court quoted the following passage from the opinion of the Court in *Yoder, supra,* 215:

> The essence of all that has been said and written on the subject is that only those interests of the highest order *and those not otherwise served* can overbalance legitimate claims to the free exercise of religion. [Emphasis added.]

Thus, while not phrased in identical terms, the standard of review applied by the Court in its decision in each of those cases consistently reflects both aspects of a heightened scrutiny standard: inquiry concerning the magnitude of the state's interest, and the necessity of the means chosen to further that interest. Furthermore, and perhaps most noteworthy, in each of those cases the Court focused on the effect that accommodating individuals' free exercise rights would have upon the achievement of the asserted governmental interest, in considering the necessity of overriding their First Amendment freedoms.[33] For example, re-

---

[33] The rights protected by the Free Exercise Clause are individual rights, and the remedy afforded is exemption. In determining whether some "compelling" governmental interest justifies overriding individuals' bona fide claims to the exercise of those rights, accordingly, the Court has consistently focused on the effect granting exemptions would have upon the achievement of the governmental interest asserted.

sponding to the State of Wisconsin's assertion that any incidental burden upon the free exercise rights of the religious observers in that case was justified because requiring school attendance of all children until the age of sixteen was essential to the achievement of the state's interest in compulsory education, the *Yoder* Court said:

> Where fundamental claims of religious freedom are at stake, however, we cannot accept such a sweeping claim; despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote by its requirement for compulsory education to age 16, and the impediment to those objectives that would flow from recognizing the claimed [religious observers'] exemption. [*Yoder,* 221. Citation omitted.]

The Court's most recent free exercise decision in *Bowen v Roy,* 476 US —; 106 S Ct 2147; 90 L Ed 2d 735 (1986), in which the Court was divided three-two-four, has not overruled or modified the standard of review consistently applied in each of those prior controlling decisions. The Court's five-to-four decision in *Goldman v Weinberger,* 475 US —; 106 S Ct 1310; 89 L Ed 2d 478 (1986), is, of course, inapplicable. The issue presented in *Goldman,* which was expressly limited to the military context, concerned "the appropriate level of scrutiny of a military regulation that clashes with a constitutional right . . . ." 89 L Ed 2d 483. While Justice Boyle's assertion that "[t]he First Amendment makes no exception for the military" (*ante,* p 504, n 27) is arguably persuasive, it was precisely that assertion which was rejected in *Goldman.* The five-member majority, relying upon a long line of precedent, held that a lower level of scrutiny is applicable to claims of constitutional violations within the specialized military society. That *Gold-*

*man* was sui generis and, thus, has not affected the Court's generally applicable prior controlling decisions cannot be seriously questioned.

Thus, if the record in the instant case supports plaintiffs' claims that their refusal to comply with the teacher certification statute is based upon sincerely held religious beliefs, and that the certification requirement interferes with or burdens the free exercise of those beliefs, the determinative question requires an inquiry concerning the nature of the state's asserted interests, and the necessity of enforcing the certification statute, as applied, to further those interests. Inherent in this inquiry is consideration of the effect accommodation by the state would have upon the achievement of that interest. If accommodating plaintiffs' religious practices with regard to the employment of teachers would cause no ascertainable harm to the state's asserted interests, no ad hoc "balancing" concerning the extent of the burden upon plaintiffs' free exercise rights is necessary; if accommodation would cause no harm to the asserted interest, then no infringement of plaintiffs' First Amendment rights may be justified by characterizing the infringement as "minimal."[34] Likewise, if a

[34] The analyses of my colleagues' opinions, in this regard, is curious. Both opinions agree, reluctantly, that plaintiffs have established that the regulation from which they seek exemption imposes a burden upon the exercise of their religious beliefs. Rather than turning to whether the state has established its required burden of proof to justify enforcing the regulation as applied, my colleagues then decide, without adequate explanation, that the interference with plaintiffs' religious beliefs is only "minimal." Neither opinion even considers whether granting plaintiffs' claimed exemption would interfere, to any extent, with the fulfillment of the state's asserted "compelling" interest.

The constitutional standard by which to determine whether the state has established its burden of proof to justify enforcing state legislation against individuals who have established bona fide religious objections to compliance therewith is identifiable. That standard does not include determining whether the state, rather than those individuals, has more correctly interpreted those individuals' religious

less intrusive alternative means is available by
which the state may ensure the continuing fulfill-
ment of its asserted "compelling" interest, that
alternative must be employed.

### A

Consideration of plaintiffs' free exercise chal-
lenge must begin with a review of the facts regard-
ing the nature of plaintiffs' schools and the effect
upon plaintiffs' exercise of religion posed by en-
forcement of the state's teacher certification re-
quirement. Individuals seeking exemption from
complying with an otherwise valid state regula-
tion, claiming protection under the First Amend-
ment's Free Exercise Clause, must establish that
their objection to compliance is based upon sin-
cerely held "religious" beliefs, and that the regula-
tion, from which exemption is sought, interferes
with or burdens the free exercise of those religious
beliefs. *Lee, supra,* 256-257. In determining
whether plaintiffs have sufficiently established
that the certification statute interferes with the
free exercise of their religious beliefs, due regard
must be given to the factual findings and conclu-
sions of the trial court. *Thomas, supra,* 716; *Lee,
supra,* 257.

The record in this case, including the testimony
of plaintiff pastors, parents, teachers, and children,
and of qualified expert witnesses in both religion
and education, clearly supports the trial court's
conclusion that the certification statute substan-
tially interferes with the free exercise of plaintiffs'
religious beliefs. The record supports the following
factual conclusions. Plaintiffs believe themselves
required to establish and maintain schools as an
integral part of their religious mission and con-

beliefs and requirements, nor does it allow the reviewing court to
make such a determination.

sider the schools to be church ministries.[35] The
record reflects that that belief stems from literal
scriptural interpretation and represents a revival
of the views of the earliest Christian movement,
with roots in the Old Testament.[36] The plaintiffs'

[35] The pastors of each church testified that their religious beliefs
require them to maintain schools as an integral part of their church.
The following excerpt from the testimony of Rene B. Ouellette, pastor
of the First Baptist Church of Bridgeport, is illustrative:

> *Q.* [*Plaintiffs' Attorney*]: Does the church maintain and oper-
> ate a school?
> *A.* [*Mr. Ouellette*]: Yes, we do, the Bridgeport Baptist Acad-
> emy.
> *Q.* Is the school incorporated?
> *A.* No, sir, the school is a ministry of our church and
> therefore not separately incorporated.
>
>       * * *
>
> *Q.* Can you describe the relationship between the church and
> the school?
> *A.* Yes. As I mentioned, the school is an integral part of the
> church's ministries. All of our teachers of our school are
> members of our church. We don't maintain a separate checking
> account for the school. In fact, all the teachers' paychecks come
> from the First Baptist Church general fund. The governing
> body of the church is also the governing body of the ministry.
> In every way we treat the school as one of the many ministries
> of our church.
> *Q.* Why does the church operate a school?
> *A.* The only reason we operate our school is because the Bible
> says, Deuteronomy, chapter six, that we are responsible to give
> to our children a godly education. The reading of that chapter
> will bear out the fact that it is to be a continual education, not
> something that takes place occasionally or on the weekend, but
> something that is to be done on a daily basis. So we have a
> divine mandate to give godly teaching and instruction to our
> children.

[36] Plaintiffs interpret Deuteronomy, chapter 6, as *requiring* their
churches to maintain and operate schools and their children to attend
those schools.

Religious expert, Dr. Rousas J. Rushdoony, testified with respect to
modern fundamentalist Christian beliefs, and their relationship to
orthodox Christianity. Dr. Rushdoony described the relationship of
plaintiffs' churches' schools to fundamentalism as follows:

> The word "church" to fundamentalism, because of it's [sic]
> biblical emphasis, is reproducing the meaning that character-

ized the church in the early century and in terms of old testament faith. The church of the old testament and the days of the new testament was the synagogue. And the synagogue was made up of an instructional ministry on the Sabbath and a weekly weekday teaching ministry to children. The early church reproduced this pattern. Joseph Bingham, in his two-volume index of a few thousand pages, points out that the early church was a place of worship, a place of instruction for the young and a library. These were the three functions of the church in the early centuries of Christian era.

Well, fundamentalism has gone back to that definition which, as I indicated, has roots in the old testament. In the old testament the ministry was two-fold: A priestly ministry that was sacrificial and levitical which was instructional. Deuteronomy 33:10 says that the function of the Levites is to be the instructors of Israel. And in Jeremiah 10:2 the warning is emphatically given from God, "Learn not the ways of the heathen." So that education is to be a function of the levitical ministry.

Well the early church, of course, did not have a sacrificing priesthood; it had a levitical ministry, and therefore it carried on the functions of the synagogue. Now, this, with barbarian invasions and the overthrow of Rome, collapsed, was reestablished with the medieval church, with the onset of enlightenism and humanism. Again there was a collapse in the educational ministry. In this country state control of education began only with Horace Mann and his associates in the early 1830s. Now we are having a return to the older concept so that fundamentalist Christianity is reviving the historic faith at this point.

* * *

The school is an integral part of the ministry of the church, since the ministry is an instructional ministry from the pulpit and from the classroom. Throughout its functioning the fundamentalist church is a levitical or instructional ministry.

Dr. Rushdoony testified with respect to fundamental Christian teaching concerning the role of the state, the religious concept of limited state "sovereignty," and the historical origin of those beliefs in both American and world history. Responding to the question whether fundamentalist Christian faith has any scriptural mandates with regard to the education of their children, he said:

Yes they do. They believe very strongly the children belong to the Lord, not to the State, and therefore they are to be reared in the nurture and admonition of the Lord. They believe that separation, the premise in terms in which their churches are established, applies very strictly also to their children as well as to their personal lives.

schools are pervasively religious; the biblical faith is applied to every subject offered in class. Every class, including those deemed by the state to be "secular" in nature, is taught from a religious perspective, and all the textbooks used are permeated with religious doctrine.[37]

The teachers in plaintiffs' schools must be members of the independent churches, "born again" Christians, and live Christian lives in and out of the classrooms, in addition to possessing the qualifications and ability to teach the academic subject matter.[38] Their role in the schools is considered a ministry for the inculcation of Christian principles, moral standards, and biblical beliefs in the lives of the children they teach, in addition to providing a religious academic environment in which the students may develop scholastically.[39]

---

[37] The record reflects that plaintiffs believe themselves religiously mandated to teach all subjects from a biblical perspective, in addition to independent Bible study. Accordingly, all textbooks used are written from a religious perspective, incorporate biblical scripture, and relate scriptural interpretation to each subject. Specific examples were offered at trial with respect to mathematics and biology textbooks.

[38] The pastors from each church testified regarding the qualifications required to teach at their schools. Pastor Ouellette explained:

> They have to have two types of qualifications. One type is a spiritual qualification. They must feel God has called them to this ministry. They must be born-again Christians. They must believe the Bible and live in and out of the classroom in accordance with our church and our faith. Then they must have the technical abilities to communicate truth to the students.

In determining a teacher's qualifications, educational background is considered by both churches. The record reflects, for example, that all of the teachers, teaching in grades one through twelve, employed by First Baptist Church of Bridgeport are college graduates.

[39] Pastor Ouellette testified as follows:

> To teach in our school is a ministry. It is not simply an occupation or profession. It's a calling.
>
> * * *
>
> It's a ministry first, because the teacher must give evidence

The teachers believe themselves to be "called" to engage in a ministry, a religious apostolate. Plaintiff teacher Kwaitkowski testified that, on religious grounds, she could not submit to the state certification regulations, even though her academic qualifications—having obtained an education degree from an out-of-state university—substantially qualifies her for provisional certification.[40]

The parents believe they are religiously required to provide their children with a fundamentalist education and that their children must be taught only by fundamentalist Christian teachers. On religious grounds, they may not enroll their children in a public school or the school of another denomination. They are deeply pleased with the education their children receive at their schools, and are closely involved in the process.[41]

The sincerity of plaintiffs' religious beliefs is supported by continuous reference to literal scriptural interpretations, and was substantiated by expert testimony. The sincerity of plaintiffs' reli-

---

to us that God is leading them to teach from a biblical perspective. We are not interested in folks who merely want a job.

Secondly, it's a ministry because every teacher has as their goal reaching the child with the gospel of Jesus Christ. Seeing that child accept the Lord Jesus as their savior and as their Lord.

Then every teacher has as their goal the inculcation into the child's life a behavior of Christian principles, moral standards that are found in God's word."

[40] Ms. Kwaitkowski testified that she could not, consistent with her religious obligations, submit to state certification. The sincerity of Ms. Kwaitkowski's religious objection is substantiated by the fact, reflected in the record, that her educational background may substantially qualify her for provisional certification.

[41] The parents of children attending each school, including plaintiffs Mr. and Mrs. Swain and Mr. and Mrs. Munson, consistently testified with respect to the mandates and requirements of their religious beliefs, and the direct scriptural origin of those beliefs. Furthermore, each parent testified that they are very pleased with the education their children are receiving, including the level of academic achievement they have demonstrated objectively through performance on standardized achievement tests.

gious belief in total independence and separation is also substantiated by their refusal to accept any form of available public aid.[42]

The state does not contest plaintiffs' claims with regard to the bona fide "religious" nature, or sincerity, of their beliefs within the meaning of the First Amendment, but continues to assert that the certification requirement does not interfere with the free exercise of those beliefs. To the extent that the state's assertion requires a determination concerning the appropriate interpretation of plaintiffs' religious beliefs, it must be rejected. As the Supreme Court stated in *Thomas, supra,* 716:

> [I]t is not within "the judicial function and judicial competence . . . to inquire whether [plaintiffs or the Government has the proper interpretation of the plaintiffs'] faith. Courts are not arbiters of scriptural interpretation."

The state's argument in this regard, with which Chief Justice WILLIAMS and Justice BOYLE seem to be in agreement, is that plaintiffs do not object to employing a certificated teacher, and, therefore, the regulation does not interfere with the free exercise of their religious beliefs. That argument, however, reflects a misunderstanding of plaintiffs' religious objection and is a non sequitur; the statutory regulation from which plaintiffs seek exemption does not require employing *a* certificated teacher, it requires them to employ *only* certificat-

---

[42] Religious expert, Dr. Rushdoony, substantiated plaintiffs' assertion that their fundamentalist beliefs require strict separation, and explained the historical origin and relationships of those beliefs in both world and American historical contexts. The record reflects that plaintiffs have refused all forms of available state, local, or federal aid and that refusal substantiates the sincerity of plaintiffs' religious beliefs with respect to total separation and their religious concept of state sovereignty.

ed teachers. Moreover, plaintiffs stress that their teachers who have submitted to state certification did so before becoming members of their churches. Likewise, that regulation does not require employing only "academically qualified" or "competent" teachers. Nor has the state asserted that plaintiffs' teachers are in any way "incompetent" or "academically" unqualified. The regulation objected to requires employing only teachers who "hold a certificate such as would qualify him or her to teach in . . . the public schools of the state." Plaintiffs do not object to employing academically competent teachers. And, for example, the record reflects that all of the teachers employed by First Baptist Church of Bridgeport, teaching in grades one through twelve, hold college degrees.

The record in this case establishes that the interference with plaintiffs' free exercise of religion is both apparent and substantial. Plaintiffs, by religious conviction, consider their schools to be religious ministries, and assert that the requirement that no one may carry out a teaching ministry in their schools without a government license to do so, is in direct conflict with their religious beliefs. Plaintiffs consider their obligation to determine whom they shall employ a religious matter, and that the criterion by which to discern who to hire is likewise pervasively religious.[43] On religious grounds, plaintiffs are prohibited from submitting

[43] See ns 35-42. The plaintiffs' religious objection to compliance with the certification regulation was articulated by all of plaintiffs' witnesses. The religious conflict posed was articulated by Reverend Fluegge, principal, administrator of the school operated by Sheridan Road Baptist Church:

Certification in the manuals from the State that I have read concerning certification refers to it as a license oftentimes. Licensing presupposes an agency or group or an entity that can designate what criteria by—it sets up the framework by which one must meet to be able to be licensed. Now I have a problem with that, because God has called our teachers to teach. He has

their teaching ministry to the prior restraint of
state licensing, requirements that their teachers
be trained in state-approved teaching institutions,
and other requirements imposed by the Teacher
Certification Code, 1979 AC, R 390.1101 *et seq.;*
1981 AACS, R 390.1101 *et seq.,* which present
numerous other burdens and limitations upon the
freedom of the plaintiffs' teaching ministry. In
addition to the general religious conflict created by
imposing the prior restraint of the state certifica-
tion requirement, plaintiffs find several of the
specific requirements of the Teacher Certification
Code to be offensive to their religious practices and
beliefs.[44]

already certified them in eternity. He has given us the criteria
whereby we discern who we hire. And to place another entity
or body above the local testament church and who it hires is to
place somebody above God, and we cannot do that.

Pastor Ouellette, articulated the religious conflict presented as
follows:

It's based upon, first of all, a scriptural conviction that we
have an obligation as individuals to obey God even if others
would differ with us. In the book of Acts, chapter five verses 27
and 28 and 29, Apostle Peter and others have been charged
"not to teach in this name." That's a quote. "Peter and the
other apostles answer and say, we ought to obey God rather
than men."
So if the state were permitted to certify and require certifica-
tion of all of our teachers, the very first, very negative affect
[sic] it would have on us is they would be put into a position of
determining whether or not a person is obeying God's call for
their life.
The second thing we have a problem with is because all of
our teachers are church employees and church staff, the state
has stepped into the area of licensing church staff.
We have a further problem because, as I understand the laws
of the State of Michigan, to get a continuing certificate, a
teacher must take 18 hours of postcollege work, postgraduate
work at a state-approved institution. The Bible tells us in
Proverbs 19 and 27, "[c]ease to hear, my son, the instruction
that causes you to err from the word of knowledge."

[44] Plaintiffs find several of the numerous provisions of the Teacher

The record in this case also supports plaintiffs' assertion that, because of the special and strict religious requirements which they must observe in the selection of their teachers, the availability of teachers for their schools would be greatly reduced were they compelled to compromise their religious beliefs and comply with the certification requirement to employ only teachers who are licensed to teach in the public schools or be closed down.[45]

Certification Code offensive to their fundamentalist beliefs. See 1979 AC, R 390.1101 *et seq;* 1981 AACS, R 390.1101 *et seq.* Plaintiffs' objections in this regard stem, primarily, from their fundamentalist belief in strict adherence to literal biblical interpretation. Plaintiffs note that few people share their strict religious beliefs, and that the administrative rules with respect to teacher certification, teacher training programs at state-approved teacher training institutions, and modern education theory generally, reflect this divergence.

For example, rule 22(1) states:

An applicant for a provisional certificate shall demonstrate that he has an acquaintance with the substance, concepts, and methods of the principal areas of human knowledge, and skills essential to communication and inquiry in modern society.

Rule 23(1)(c) requires an understanding of:

The methods and materials of instruction appropriate to the elementary or secondary level.

Plaintiffs emphasize that their religiously required beliefs, with respect to education, are, necessarily, inconsistent with those of the state, and of the state-approved teacher training institutions within this state of which none are of the fundamentalist faith.

Likewise, the requirements imposed by Rule 15(2), and 25(1), that "[c]redits toward certification shall be completed through an approved teacher education institution," and that applicants "shall be recommended by a Michigan college or university" that has been so approved, present religiously based problems for plaintiffs.

The sincerity, and magnitude, of plaintiffs' religiously based objection to modern education theory is exemplified in Sheridan Road's *Parent-Student Handbook,* in which the fundamentalist theory of education is contrasted with that of "the world."

[45] The state has conceded that a direct effect of enforcing the regulation as applied to plaintiffs would be to limit the number of teachers qualified to teach at plaintiffs' schools. That enforcing the certification regulation would have a drastic and possibly prohibitive effect upon the ability of plaintiffs' schools to employ qualified teach-

Qualified education expert, Dr. Russell A. Kirk, testified that, as a practical matter, compelled compliance with the statutory regulation here in question would have a drastic effect upon the ability of independent church schools to employ teachers who meet their qualifications, and in many cases the effect would be prohibitive, forcing such schools to close.

That the state certification requirement interferes with the fundamental free exercise rights of William and Sharon Swain and Ronald and Janice Munson as parents, and of Susanne Kwaitkowski as a teacher, is also apparent.[46]

The teacher certification requirement compels plaintiffs to choose between compromising their religious beliefs and conforming to the state's administrative interests or being prohibited from maintaining and operating their schools and having their children compelled by law to attend a school against the wishes and religious beliefs of their parents. Plaintiffs' only other option would be to leave Michigan and seek another jurisdiction, the overwhelming majority of which do not impose state teacher certification requirements upon religious schools.[47] To the extent that the operation of plaintiffs' schools is religiously man-

ers was substantiated by the testimony of education expert, Dr. Russell A. Kirk.

[46] The parents believe they are fulfilling their religious obligations and that their children are receiving an education of excellent quality. Ms. Swain testified that if Bridgeport Baptist Academy were to be closed down for refusal to submit to the certification regulation, she would have no choice but to keep her children at home and teach them herself, even though taking the time to teach her children every day "would be a hardship on [her] family."

Ms. Kwaitkowski would be prohibited from fulfilling her religious obligation within this state.

[47] See n 58 for a list of the few states currently imposing state certification requirements. It has been noted that "[f]orced migration of religious minorities was an evil that lay at the heart of the Religion Clauses." *Yoder, supra,* 218, n 9.

dated, the certification statute directly regulates religious activity. Unlike the more indirect interferences with the free exercise of religion created by the legislation challenged in *Sherbert, supra, Thomas, supra,* and, more recently, in *Bowen, supra,* the state certification requirement does not confront plaintiffs with a choice between adhering to their religious beliefs and receiving a governmental benefit. Nor does it allow plaintiffs a choice between adhering to their religious beliefs and exercising a privilege. Cf. *Braunfeld v Brown,* 366 US 599; 81 S Ct 1144; 6 L Ed 2d 563 (1961). Unlike the legislation challenged in *Bob Jones Univ v United States,* 461 US 574; 103 S Ct 2017; 76 L Ed 2d 157 (1983), the state certification requirement "inescapably compels conduct that [plaintiffs] find objectionable for religious reasons." *Bowen, supra,* 90 L Ed 2d 749. It, in every sense, "affirmatively compel[s] [plaintiffs], by threat of sanctions, to refrain from religiously motivated conduct or to engage in conduct that they find objectionable for religious reasons." *Id.,* 747. The interference, especially with respect to the rights of plaintiff parents, is certainly more substantial than the indirect burdens imposed upon the free exercise of religion by the legislation challenged in those cases.[48]

My colleagues' representations of plaintiffs' claims are distorted. Justice BOYLE's assertion, for example, that "certification itself is not opposed, but [only] the government compulsion to attain it," is misplaced, and does not relate to the challenged regulation. Plaintiff parents, churches, and pastors are not compelled to attain certification; the legislation challenged regulates whom they *must* em-

[48] The regulation "affirmatively compels [the plaintiffs] . . . to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder, supra,* 218; *Sherbert, supra,* 402.

ploy to educate their children. Plaintiffs have specifically, and directly, challenged the enforcement of that legislation, and the factual record supports the trial court's findings that the challenged regulation does, in fact, substantially interfere with the free exercise of plaintiffs' *sincerely held* religious beliefs. See n 43.

### B

That the legislation in question affirmatively interferes with religiously motivated activity does not, of course, end the analysis. The individual religious autonomy guaranteed by the First Amendment's Free Exercise Clause is not absolute, and the state may justify enforcing the regulation notwithstanding the interference with plaintiffs' religious freedom by showing that enforcement is essential to the fulfillment of a compelling state interest. The state agrees that the "compelling state interest" standard of review is applicable in the present case.[49] The state argues, however, that the certification requirement need only be "reasonably related" to furthering its "compelling" interest in compulsory education, in order to justify the infringement upon plaintiffs' First Amendment rights. My colleagues' opinions ultimately rely upon that misapplication of the applicable standard of review, as did the Court of Appeals in reaching its decision in the present case.[50]

Determining whether the state has established that enforcing the teacher certification statute, as

[49] The state conceded, in its brief and at oral argument, that it was in agreement with plaintiffs that the compelling state interest standard of review applied by the Court in *Sherbert* is applicable in the present case.

[50] See n 4. See also part VI. Although through completely different analyses, both of my colleagues' opinions for affirmance would uphold the enforceability of the certification statute, in effect, by applying the rational-basis standard of review.

applied to plaintiffs, is essential to the achievement of its "compelling" interest requires an inquiry concerning the nature of the state's legitimate interests in *compulsory* education and the necessity of enforcing the certification requirement as applied to plaintiffs. "[O]nly those interests of the highest order *and those not otherwise served* can overbalance legitimate claims to the free exercise of religion." *Yoder, supra,* 215. (Emphasis added.)

It has long been established that the governmental interest in compulsory education is not unlimited.[51] See *Yoder, supra,* 215, 232-234. The Supreme Court's decision in *Yoder* is particularly instructive because the governmental interest asserted by the State of Wisconsin in that case, like the interest implicated in the present case, was the public interest in compulsory education. While the governmental interest asserted in the instant case is indistinguishable from the interest asserted by the State of Wisconsin in *Yoder,* the religious exemption plaintiffs seek is readily distinguishable from that which was sought, and constitutionally mandated, in *Yoder:* Plaintiffs do not oppose conventional formal education, but only the statutory and administrative requirements that they employ only teachers who have complied with the state's certification rules.[52]

---

[51] The governmental interest involved in this case, despite the rhetoric cited in the Chief Justice's opinion, is not the state's interest in providing the opportunity for all of its citizens to have access to good education. To the contrary, the governmental interest involved in this case is antithetical to educational freedom. The relationship of the private and parochial schools act of 1921 to the compulsory education act of 1905 is expressly conveyed in § 4 of the 1921 act. See text accompanying n 6. The societal interest involved in this case is identical to the governmental interest asserted by the State of Wisconsin in *Yoder.*

[52] Plaintiffs do not oppose formal scholastic education in any sense. Providing the opportunity for their children to obtain a high level of

In order to justify overriding plaintiffs' fundamental First and Fourteenth Amendment rights, the state must establish that enforcing the certification requirement, without exception, is essential to ensure the adequate "secular" education required by the compulsory education law. The state conceded at the outset of the procedings in this case, however, and the record supports the factual conclusion, that plaintiffs are providing a quality "secular" education for their children, without compliance with that statutory requirement.[53] The state's seemingly inconsistent position in this regard may stem from its misdirected focus, and, perhaps, misunderstanding of its burden of proof to justify overriding fundamental First Amendment rights. The religious freedom protections afforded by the Free Exercise Clause of the First Amendment are "individual" rights. Consideration of whether individuals whose free exercise of religion is substantially burdened by state legislation are entitled to exemption from that otherwise valid state law, accordingly, requires that the focus be directed to the rights of those individuals.

academic achievement is, indeed, a primary goal of plaintiffs' religious alternative to the state regulation in question, and the record reflects that plaintiffs' schools maintain strict academic discipline.

[53] The state conceded, when questioned by the trial court at the conclusion of its opening statement, that it was "not at all" asserting that plaintiffs were failing to adequately educate their children:

> *The Court:* Mr. Gartner [Defense Attorney], you are not coming before the Court claiming that the children at issue, relative to the plaintiffs, are receiving at this point in time inadequate education?
> *Mr. Gartner:* No, not at all.
> *The Court:* So we are talking primarily relative to the impact of the administrative rights here one way or another. It's not—there is no allegation on your part that the children are being deprived of an education or are being miseducated as a result of some factor which brings this before the Court?
> *Mr. Gartner:* No. No.

In establishing its burden of proof, in such cases, that enforcing the regulation is *essential* to the achievement of a compelling governmental interest, the state must show that granting an accommodation would "unduly interfere with [the] fulfillment of th[at] governmental interest." *Lee, supra,* 259.

In determining whether the governmental interest in compulsory education justifies overriding plaintiffs' individual rights protected by the Free Exercise Clause, therefore, the focus must be directed upon the effect accommodation would have upon the achievement of that interest. Nothing in the record in this case suggests that granting plaintiffs an exemption from the certification requirements would interfere with the state's legitimate interests in compulsory education. To the contrary, the uncontested evidence in this case supports the conclusion that plaintiffs are providing a more than adequate "secular" education for their children, to the legitimate extent required by the compulsory public education statute.[54]

Nothing in the record in this case intimates that granting religious exemptions from the certification requirement would present "grave and immediate" danger to the state's legitimate interests in compulsory education. *West Virginia Bd of Ed v Barnette,* 319 US 624, 639; 63 S Ct 1178; 87 L Ed 1628 (1943). While the state has continuously asserted that the governmental interest in compulsory education is "compelling," it has presented no evidence that granting religious exemptions would have any adverse effect whatsoever upon the

---

[54] All of plaintiffs' witnesses testified with respect to the quality and quantity of "education" provided the children attending plaintiffs' schools. That the children attending each school are progressing at acceptable and, indeed, above average levels of scholastic achievement is documented by the standardized academic achievement test results presented and made a part of the record in this case.

achievement of that interest, and the record supports a contrary conclusion. The ability of religious schools, similar to plaintiffs', to achieve and maintain excellence in education, without employing only teachers who are certified to teach in the public schools, was substantiated by uncontroverted expert testimony.[55]

The state's interest in *compulsory* education is

[55] Education expert, Dr. Russell A. Kirk, for example, testified with respect to some of the variables which influence the success of religious schools and distinguished their methodology from that of the public schools. Dr. Kirk noted the superior discipline generally found in religiously related schools and the elevated level of teacher motivation, and accountability, in such schools as two factors contributing to their general success. Dr. Kirk described the attributes of a "good" teacher in the following order:

(1) the ability to understand children and the yearning to teach them;

(2) earnestness; taking education seriously and children seriously;

(3) formal study of methods and tests.

Dr. Kirk concluded by opining that the state's interests in promoting quality education is best served by encouraging diversity and variety, competition, and freedom of choice, and, thus, that accommodating plaintiffs' religious conflict regarding complying with the certification regulation, rather than "wiping [them] out," would actually further the state's broad interest in education.

The testimony of education expert, Dr. Donald A. Erickson, also supports the conclusion that plaintiffs can achieve excellence in education without compliance with the certification requirement. Dr. Erickson testified with respect to the factors or conditions which influence the success of "good" schools, with reference to empirical and scholarly research. He testified that the most important factor is the social climate of the school, "a climate of stable discipline," and "a focus on student learning" on the part of the students and their parents. Dr. Erickson testified with respect to the learning environment found in religious schools, as contrasted with the public schools, and discussed the results of empirical studies on the topic. Finally, Dr. Erickson emphasized that the commitment of teachers and involvement of parents in the educational process are positive factors, and commented with respect to data evidencing the existence of such involvement in religious schools. He further emphasized and explained that, unlike other professions (e.g., law, medicine, architecture), teaching is founded upon no clearly established knowledge base; it is in no sense comparable to professions which possess "a body of clinical knowledge," or a "body of accumulated wisdom," or "specific prescriptions for practice." He referred to empirical data in supporting his opinion that the governmental interest in compulsory education would not be threatened by granting religious exemptions for compliance with the certification regulation.

important, and identifiable; the state may require all of its citizens to achieve a given level of academic achievement to "prepare [them] to participate effectively and intelligently in our" democratic process, and to "prepare[ ] individuals to be self-reliant and self-sufficient participants in society." *Yoder,* 221. The uncontested evidence in this case, however, reflects that plaintiffs "are . . . fulfilling the social and political responsibilities of citizenship," legitimately imposed by the compulsory public education statute, without compelled compliance with the state's certification requirement "at the price of [compromising] their free exercise of religious belief." *Yoder,* 225. There is no indication that plaintiffs are failing to provide their children with the academic competence needed for political literacy and economic self-sufficiency. The state has conceded, moreover, that such is not the case.[56]

Any argument by the state that its legitimate authority as *parens patriae* requires upholding the enforcement of the certification requirement, as applied, to protect these children from their parents, must fail. The state has not even suggested that the "decisions [of plaintiffs-parents have] jeopardize[d] the health or safety of the child[ren], or have a potential for significant social burdens." *Yoder,* 234. The record abundantly supports the conclusion that plaintiffs are actively pursuing and fulfilling the legitimate and important academic achievement and socialization interests underlying the compulsory education law.

The state has failed to show, in this case, that enforcing the certification requirement, as applied to plaintiffs, is essential to the fulfillment of its interest in compulsory education; establishing the mere "rational-basis" of enforcing the regulation

[56] See n 53.

to further the achievement of that public interest is, of course, insufficient.[57] On the other hand, a careful review of the record in this case, including the testimony of qualified experts and the documented record of student achievement, supports the conclusion that enforcing the certification requirement is not essential to the fulfillment of the state's asserted interest. The record abundantly supports the conclusion that accommodating plaintiffs' religious conflict to the state teacher certification requirement poses no threat to the state's interest in compulsory education.

In this regard, plaintiffs' uncontested assertion that the overwhelming majority of the states (forty-four) do not currently impose such a requirement upon the employment practices of nonpublic schools, without exception, should not be overlooked by this Court.[58] Unless we are to assume that those states are failing to achieve the adequate education of their citizens (a proposition that has not been suggested), that evidence is relevant and should be considered. Moreover, it should be noted that the clear trend among those few states which have imposed such a requirement has been to abrogate teacher certification requirements for religious schools, or to provide exemptions for individuals who raise sincere religious objections to compliance.[59] Additionally, that the

[57] The state was unable to establish any relationship in fact between compliance with the administrative teacher certification rules and increased quality in teacher competence and student learning. Dr. Donald A. Erickson testified with respect to the existence of extensive empirical evidence that no such relationship has been found.

[58] The few states currently imposing such regulations, other than Michigan, are: Hawaii (Hawaii Rev Stat, § 297-2), Idaho (Idaho Code 33-1201), South Dakota (SD Codified Laws Ann 13-4-2), Iowa (Iowa Code Ann, § 299.1), and Washington (Wash Rev Code Ann 28A.02.201.

[59] Alaska, North Carolina, West Virginia, and Vermont have recently repealed school approval or teacher certification requirements for church schools. See former Alas Stat, § 14.45.010, NC Gen Stat,

Legislature is currently considering legislation that would dramatically alter this state's teacher certification program,[60] and the current national interest concerning the quality of student achievement in the public school systems and the effectiveness of teacher training programs is relevant and should be considered.[61]

The record in this case reflects the lack of any evidence whatsoever that accommodating plaintiffs' religiously based conflict with the teacher certification requirement would interfere with the state's asserted interest in "assuring that an education is being provided for all of its youth." Additionally, I am convinced that less burdensome alternative means exist by which the state can supervise and ensure the future fulfillment of that important interest.

The record in this case firmly supports the con-

115C-547 *et seq.,* Ala Code, § 16-28-1 *et seq.,* W Va Code, § 18-8-1, as amended, and Vt Stat Ann, tit 16, § 165a. Ohio has recently exempted religious schools from the requirement, Ohio Administrative Code, § 3301-35-08. Nebraska recently amended its statutory requirement that parents have their children taught only by certified teachers, allowing religious exemptions. Uncertified teachers must either take a nationally recognized teacher competency examination or offer other evidence of teacher competence. Nebraska Legislative Bill 928, amending Neb Rev Stat, §§ 79-201, 79-328, and 79-1701. Iowa is currently considering abrogating the certification requirement it had formerly imposed upon the recommendation of a specially assembled Governor's task force report. See Detroit News, December 2, 1985, *postscript.*

[60] The State Senate introduced a bill, which recently received unanimous approval by the House Education Committee (SB 447). The bill was sent to the House Appropriations Committee for an examination of the potential costs, estimated to be $4.5 million, to develop and implement the program. The bill would institute radical changes in the certification program in that it would require the Board of Education to develop and administer basic literacy tests beginning in 1991, and teacher competency tests beginning in 1993. See Michigan Report, March 11, 1986, Report No 47, Vol 25, pp 2-3.

[61] See, e.g., Report of National Commission on Excellence in Education, *A nation at risk,* p 5 (April 26, 1983), in which the National Commission on Excellence in Education reported its stark and dismal conclusions concerning the quality of public education throughout our nation.

clusion that the state can adequately supervise the fulfillment of its asserted interest by reviewing the academic achievement of plaintiffs' students, measured by their performance on national standardized academic achievement tests. Plaintiffs agree that such supervision is a substantially less burdensome form of regulation, and that no religiously based conflict would be created. Plaintiffs currently administer national standardized achievement tests beginning at the prekindergarten and kindergarten level, and such testing is pursued throughout the entire educational experience of the children attending plaintiffs' schools.[62]

Any assertion by the state that this alternative means is inadequate because the validity of such standardized achievement tests is questionable must be rejected. The record in this case, including the testimony of the state's own education expert, supports the conclusion that the validity of such tests is well-established and, indeed, that this alternative is a superior method of measuring student learning and good teaching.[63] The record supports the conclusion that a higher, and more objectively identifiable, correlative relationship exists between standardized achievement test results and student learning, than between state teacher certification and student learning.[64] The State

[62] Plaintiffs administer the tests early to diagnose any possible learning deficiencies, or to determine placement, and continue testing to monitor scholastic achievement throughout the student's entire educational experience.

[63] The state's education expert, Dr. Judith Lanier, testified that testing was "at the top" of her list of methods for measuring good teaching. Education expert, Donald A. Erickson, also testified with respect to the acceptability and objective accuracy of testing as a method of measuring adequate teaching and student learning.

[64] Dr. Lanier testified that she was unaware of any empirical evidence establishing any correlation between compliance with the administrative certification rules and teacher competence or student learning. She testified that such evidence does exist, on the other

Board of Education, moreover, has published its endorsement and approval of the use of such testing to measure and improve student achievement.[85]

Finally, any assertion by the state that reviewing achievement test performance, as an alternative means, is actually more intrusive upon plaintiffs' free exercise of their religious beliefs than enforcing the state certification requirement, must also be rejected. To accept that proposition would require holding that the state, rather than plaintiffs, has correctly interpreted the mandates and restrictions of plaintiffs' religious convictions. The unwarranted implications of such a holding are obvious.[66]

The use of standardized achievement test results is an adequate, and perhaps even superior, alternative means by which the state can ensure that an "education is being provided to all of its youth," without infringing upon plaintiffs' fundamental First and Fourteenth Amendment freedoms. The state could request achievement test results along with the other information concerning the enrollment of students and courses of study to which plaintiffs are in agreement.

hand, establishing the accuracy and appropriateness of testing, and stated that testing is a superior method of determining good teaching and student learning. See n 63. Dr. Erickson testified that extensive research has established that no significant correlation exists between certification and competence or student learning, and that testing is an established and far superior method to determine student learning and teacher effectiveness.

[65] E.g., Michigan Educational Assessment Program, 1983-84, p 7:

"Much is known about the use of testing results to improve student achievement."

The Superintendent of the Bridgeport Spalding Community School District testified that nationally standardized tests are employed in the public schools within that district.

[66] See *Lee, supra,* 257; *Thomas, supra,* 716.

While the existence of other permissible means by which the state can adequately ensure its interest in compulsory education is not foreclosed, the record and constitutional considerations presented render clear the conclusion that enforcement of the teacher certification requirement, as applied, is not essential to achieve that objective. Unless and until the state can show otherwise, the enforcement of the statutory teacher certification requirement, as applied, would be violative of the First and Fourteenth Amendments. Accordingly, I would reverse the decision of the Court of Appeals, and reinstate the trial court's order enjoining the enforcement of § 3 of the private and parochial schools act as applied to plaintiffs. The state would still be able to enforce the teacher certification requirement to regulate the employment practices of nonreligious schools and religious institutions except where bona fide religious claims to exemption are implicated.

The accommodation required by the First Amendment's Free Exercise Clause would not, in the present case, run afoul of the Establishment Clause; the accommodation required by the Free Exercise Clause reflects the neutrality that the Establishment Clause compels. *Yoder*, 234-235, n 22; *Sherbert, supra,* 409. While the Court has recognized the Establishment Clause concerns in light of the values protected by the Free Exercise Clause, exemptions necessary to vindicate free exercise rights have consistently been upheld.[67] *Id.* The First Amendment "mandates accommodation, not merely tolerance." *Lynch v Donnelly,* 465 US 668, 673; 104 S Ct 1355; 79 L Ed 2d 604 (1984).

[67] See Marcus, *The forum of conscience: Applying standards under the Free Exercise Clause,* 1973 Duke L J 1217, 1235-1238; Giannella, *Religious liberty, nonestablishment, and doctrinal development: Part II, the nonestablishment principle,* 81 Harv L R 513 (1968).

VI

While my disagreement with the analyses of my colleagues is evident, I am compelled to express additional criticism because I am convinced that they, like the Court of Appeals in reaching its decision in the present case, have misapplied the standard of review mandated by the First Amendment for determining whether legitimate claims to the free exercise of religion may be overridden. I disagree with Chief Justice Williams' analysis in several respects, including his identification, and discussion, of the state's asserted "compelling" interest involved in this case, and the state's burden of proof to justify the overriding of plaintiffs' First Amendment rights. I am equally persuaded that Justice Boyle's opinion is internally inconsistent and, with all respect, does not support her ultimate conclusion that the state is not required, in this case, to justify the interference with plaintiffs' fundamental First and Fourteenth Amendment rights.

A

Chief Justice Williams identifies the state's interest as "ensuring that *all* teachers have met certain minimum requirements . . . ." *Ante,* p 467. The Chief Justice, however, in his subsequent discussion, refers to the state's interest in the "education of its citizens" as the compelling interest involved. *Ante,* p 478. Finally, the Chief Justice reaches his analytical conclusion in reconciling the inconsistent identification of the "compelling" interest involved:

Therefore, to the extent that certification of teachers furthers education, it can be considered a compelling state interest. [*Ante,* p 481.]

Hence, Chief Justice WILLIAMS' identification of the "compelling" state interest involved culminates in narrowly construing that interest until it is actually identical to the means chosen to further it: How else could the state achieve its "compelling" interest in "certification of teachers" but to require "certification of teachers"? In considering whether a "less intrusive method" is available to the state, however, the Chief Justice returns to his identification of the governmental interest involved as "the education of . . . citizens." *Ante,* p 484.[68]

While the Chief Justice's failure to consistently identify the "compelling" state interest involved is confusing, the ultimate utility to his analysis is obvious. In considering the free exercise issue presented, the Chief Justice ignores the second aspect of the constitutionally mandated heightened standard of review: whether enforcing the certification requirement, as applied to plaintiffs, is essential to the fulfillment of the asserted "compelling" governmental interest. Chief Justice WILLIAMS avoids this crucial determination and concludes, as did the Court of Appeals, that as long as the state's interest in the "education of its citizens" is a "compelling" interest the state need only show that the certification requirement is theoretically rationally related to the furtherance of that interest to justify the infringement of plaintiffs' First Amendment rights. While the

[68] Likewise, Justice BOYLE's opinion fails to consistently identify the governmental interest involved (see, e.g., *ante,* pp 497-498, 507-508, 510-511), ultimately concluding that "[t]he teacher certification requirement[ ] [is] a compelling state interest of [its] own right [as well as] a state regulation . . . to achieve the broader goal of quality education." *Ante,* p 511. Directly preceding that conclusion, however, Justice BOYLE refers to the state's "compelling interest in *compulsory education,"* (*ante,* p 511), and earlier in the opinion as "the state's interest in assuring that every child receive at least a minimal education." *Ante,* 497.

Chief Justice may, as the Court of Appeals did, find support for that standard of review in some of the decisions of the state courts of other jurisdictions,[69] that standard has been expressly rejected in the controlling decisions of the United States Supreme Court. *Sherbert, supra,* 406; *Yoder, supra,* 215.[70] Furthermore, that standard of review would render the fundamental protections afforded by the Free Exercise Clause meaningless; the First Amendment is not needed to protect individuals from "unreasonable" or "irrational" legislation.

In addition to applying what is, in my opinion, an incorrect standard of review, the Chief Justice obscures the nature of the governmental interest involved in this case. The governmental interest involved in this case is not the state's interest in providing "the opportunity of an education"[71] to its citizens. Whether the state is achieving that com-

[69] See *Nebraska ex rel Douglas v Faith Baptist Church,* 207 Neb 802; 301 NW2d 571 (1981), app dis 454 US 803 (1981), and *State v Shaver,* 294 NW2d 883 (ND, 1980) (to justify suppressing the free exercise of minority religious beliefs it is sufficient that the regulation in question is reasonably related to the state's interest in furthering quality in education).

[70] Likewise, the better-reasoned decisions of other state courts have followed the controlling cases and rejected that standard of review. See *State v Whisner,* 47 Ohio St 2d 181; 351 NE2d 750 (1976); *Kentucky State Bd for Elementary & Secondary Ed v Rudasill,* 589 SW2d 877 (Ky, 1979), cert den 446 US 938 (1980). See also *State v Yoder,* 49 Wis 2d 430; 182 NW2d 539 (1971), aff'd, *Wisconsin v Yoder, supra; Parker Collegiate Institute v Univ of New York,* 298 NY 184; 81 NE2d 80 (1948); *Bangor Baptist Church v Maine Dep't of Ed,* 576 F Supp 1299 (D Me, 1983).

[71] My colleague's reference to *Brown v Topeka Bd of Ed,* 347 US 483; 74 S Ct 686; 98 L Ed 873 (1954), is misplaced. The governmental interest involved in the present case does not concern providing access to education. The state's interest in the present case does not involve the protection of educational freedom, but, rather, the restriction of educational freedom.

The plurality's attempt to characterize the religious exemption sought by plaintiffs as contrary to the state's goal of furthering educational freedom is perplexing. Accommodating plaintiffs' religious conflict in this case would have no effect whatsoever upon the state's interest in providing educational opportunities to all of its citizens.

pelling interest by providing access to "quality" in education through its public schools, while perhaps indirectly related to the issues raised in this case,[72] is quite distinguishable from the state's legitimate interests in *compulsory* education. The Chief Justice's emphasis on the importance of the state's interest in providing the opportunity of an education tends to obscure the nature of the state's interest in *compulsory* education which involves the state's legitimate interests in *compelling* its citizens to achieve "an education" and the extent to which the state may standardize, regulate, and compel the manner in which its citizens achieve "an education." Like *Yoder,* this case involves "the fundamental interests of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Yoder, supra,* 232. The Court in *Yoder* said, referring to the legitimate, but constitutionally limited, governmental interest in *compulsory* education:

> [W]hen the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a "reasonable relation to some purpose within the competency of the State" is required to sustain the validity of the State's requirement under the First Amendment. [*Id.,* 233.]

B

Justice BOYLE's discussion and application of the required standard of review and the factual record in this case is perplexing. Justice BOYLE acknowledges that plaintiffs' First Amendment claims re-

---

[72] The record reflects that the public school district officials who initiated the proceedings against plaintiffs' schools have published their economic interest in "prevent[ing] loss of students to nonpublic schools." See n 9.

quire reviewing the challenged legislation "under a strict scrutiny or compelling state interest standard." *Ante,* pp 487-488. She articulates that standard of review in the free exercise context as follows:

> "First, when the government attempts to deny a Free Exercise claim, it must show that an unusually important interest is at stake, whether that interest is denominated 'compelling,' 'of the highest order,' or 'overriding.' Second, *the government must show that granting the requested exemption will do substantial harm to that interest* . . . ." [Emphasis added. *Ante,* p 489, quoting *Goldman v Weinberger,* 475 US —, —; 106 S Ct 1310, 1325; 89 L Ed 2d 478, 498 (1986) (O'Connor, J., dissenting).]

Justice BOYLE declines applying that standard of review in this case, however, ultimately concluding that she "do[es] not find it necessary to require the state in this case to show with more particularity how its compelling interest in compulsory education will be adversely affected by granting an exemption to plaintiffs."[73] *Ante,* p 511. While the rationale asserted in reaching that conclusion is unclear, it seems to be based upon a "belief/action and direct/indirect" interference analysis (*ante,* p 490), the Court's recent decision in *Goldman, supra,* and interpreting *Yoder, supra,* for the proposition that plaintiffs, in free exercise cases, have the burden to "clearly and convincingly" establish the existence of a lesser restrictive alternative to the challenged regulations. *Ante,* p 501. I am persuaded that Justice BOYLE's analysis does not sup-

---

[73] Justice BOYLE's opinion does not conclude that granting the requested exemption in this case would adversely affect the state's interest in compulsory education to any extent whatsoever. The state has never made such an assertion, and the extensive record in this case, including the testimony of the state's expert witness, would not support such a conclusion.

port the ultimate and dispositive conclusion; that the state may justify the interference with plaintiffs' constitutionally protected rights, in this case, without even attempting to show, indeed without even asserting, that an exemption would adversely affect, to any extent, the achievement of the state's interest.

The "belief/action and direct/indirect" dichotomies, discussed but not relied upon in Justice BOYLE's opinion, have long been abandoned in the controlling decisions of the United States Supreme Court, inasmuch as either would be applicable in the present case.[74] The argument that the Free Exercise Clause protects only religious "belief" and, therefore, that religiously grounded "actions" are outside the protections of the First Amendment, accepted in *Reynolds v United States,* 98 US 145; 25 L Ed 244 (1878), was expressly rejected in *Cantwell v Connecticut,* 310 US 296; 60 S Ct 900; 84 L Ed 1213 (1940), and again more recently in *Yoder, supra,* 219-220, in which the Court noted that several state courts were continuing to rely upon that rejected dichotomy. *Id.,* 219, n 10. See also *id.,* 247 (Douglas, J., dissenting in part).

Whether state action based on one's religious belief is, under any circumstances and in all cases, *absolutely* prohibited by the First Amendment is an issue not implicated in the present case. Plaintiffs have certainly not argued that their free exercise rights are absolute; their argument is that enforcing the constitutionally suspect legislation in question is not essential to vindicate a compelling state interest. Justice BOYLE's statement that "this Court 'should be cautious in expanding the *scope*

---

[74] The applicability of Justice BOYLE's discussion in this regard to her analysis in this case is unclear. Her opinion states that it is not relevant to the appropriate "level of judicial scrutiny," *ante,* p 492, n 9, but that it is relevant to the "kind and quantity of proofs required by the government to satisfy the strict scrutiny test." *Ante,* p 492.

of [the absolute protections afforded belief . . .]
since to do so might leave government powerless
to vindicate compelling state interests,' " (*ante*, p
495), is, thus, misplaced, and her entire discussion
in this regard, taken largely from *McDaniel v
Paty*, 435 US 618, 626; 98 S Ct 1322; 55 L Ed 2d
593 (1978), is irrelevant to the issue presented in
the instant case.

Likewise, the argument that legislation which
imposes only indirect burdens upon the free exer-
cise of religion (i.e., coerces individuals to choose
between receiving a governmental benefit or privi-
lege and adhering to religious belief) is outside the
protections afforded by the Free Exercise Clause,
or that such legislation mandates a lower level of
judicial scrutiny, has consistently been rejected.
See, e.g., *Bob Jones Univ, Lee, Thomas, Yoder,
Sherbert,* and *Braunfeld, supra.*

Like the discussion and application of the belief/
action and direct/indirect analyses, Justice
Boyle's discussion of the recent decision in *Gold-
man, supra,* is analytically unrelated to the ulti-
mate premise which supports the basis of her
opinion. Nevertheless, I am compelled to express
my disagreement with the implication in that
opinion that *Goldman* has effected the standard of
review applicable in free exercise cases which
arise outside of the military setting.

*Goldman* is offered for the proposition that in
free exercise cases "the higher in rank the govern-
mental interest, the less the need for necessity to
support the means chosen to achieve it even where
paramount personal rights are directly burdened."
*Ante*, p 505. That proposition seems to relate to
the unsupported statement that "the Supreme
Court has acknowledged that certain government
interests are so compelling that the state need not
show that the means chosen is absolutely essential

to further that interest, and that no lesser restrictive alternative could be substituted." *Id.,* p 500.

That *Goldman* is *sui generis* because it concerned a military regulation is unquestionable. In deciding "the appropriate level of scrutiny of a military regulation that clashes with a constitutional right," the five-member majority, per then Justice Rehnquist, said, relying upon a long line of cases:

> "[T]he military is, by necessity, a specialized society separate from civilian society."
>
>          \*   \*   \*
>
> The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service."
>
>          \*   \*   \*
>
> "[W]ithin the military community there is simply not the same [individual] autonomy as there is in the larger civilian community."
>
>          \*   \*   \*
>
> Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.
>
>          \*   \*   \*
>
> "Judicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." [*Goldman, supra,* 89 L Ed 2d 483-484. Citations omitted.]

The *Goldman* majority appears to have applied a rational-basis standard of review to the military regulation challenged in that case, although Justice Brennan, dissenting, described it as "a subrational-basis standard—absolute, uncritical 'deference to the professional judgment of military

authorities.' " *Id.,* 489. (Brennan, J., dissenting, quoting the majority opinion, 484.) The four dissenters in *Goldman* were unpersuaded that a special exception from the generally applicable standard of review should be applied to military regulations. See *id.,* 489, n 2 (Brennan, J., dissenting); *id.,* 495-496 (Blackmun, J., dissenting); *id.,* 497 (O'Connor, J., dissenting).

Justice BOYLE's ultimate analysis is based upon an interpretation of *Yoder, supra,* for the proposition that individuals asserting free exercise claims, in addition to having the burden of establishing that the regulation challenged interferes, in fact, with the free exercise of their sincerely held religious beliefs, also have the burden of establishing "the sufficiency of their alternative mode" of advancing the state's asserted interests. *Ante,* p 503. I am persuaded that that proposition is not only unsupported by *Yoder,* it is internally inconsistent. Justice BOYLE states that "once a plaintiff has established that a regulation burdens the exercise of religion, the state must establish that a 'compelling state interest' is at issue and *that the interest cannot otherwise be served."* (Emphasis added.) *Ante,* p 498. The second aspect of the state's burden of proof in this regard relates to the necessity of enforcing the regulation to fulfill the state's asserted interest. Because the remedy in free exercise cases is exemption, that analysis requires the state to show that granting the exemption would interfere with the state's asserted interest. If the state has not shown that granting the exemption would, to any extent, adversely affect the achievement of the asserted "compelling" interest, it has not shown, a fortiori, that the interest "cannot otherwise be served" or that "no less intrusive alternative means" is available. In such situations, an entirely nonintrusive alternative is available,

and the interest can otherwise be served because granting the exemption will not negatively interfere with the achievement of the asserted societal interest. In that situation, it is unnecessary to undertake an analysis of the extent of the burden upon the plaintiffs' religious beliefs, which necessarily entails the subjective interpretation of the centrality of those beliefs within plaintiffs' religion, to subjectively balance the degree of that burden against the extent an exemption would interfere with the state's interest. If the state cannot establish that granting an exemption would harm the state's interest to any extent, there is nothing against which to subjectively balance the restriction of plaintiffs' rights.

Justice BOYLE's application of *Yoder* in the present case is inapposite. In *Yoder,* the Court implicitly conceded that the Amish children who failed to attend high school would not receive the same level of intellectual learning and, thus, that the state's objective would not be as fully realized if an exemption were given. The Court went further, however, and held that the resulting adverse effect upon the achievement of the state's interest did not *unduly* interfere with the fulfillment of that interest. Thus, the Court implicitly held that it was not quite sufficient for the state to show that an exemption would impair its ability to fully achieve its goals; an exemption was required even at some slight sacrifice to the state's objectives. *Yoder,* thus, stands for the proposition that the state's interest must be read broadly and flexibly in determining whether that interest could still be fulfilled if an exemption were granted.[75]

---

[75] See, e.g., Pfeffer, *The supremacy of free exercise,* 61 Geo L J 1115 (1973); Marcus, n 67 *supra;* Kurland, *The Supreme Court, compulsory education and the First Amendment's religion clauses,* 75 W Va L R 213 (1973). See also, e.g., Tribe, Constitutional Law, § 14-10; Nowak, Rotunda & Young, Constitutional Law, Ch 19, § III.

Justice Boyle would apply *Yoder* in the present case to uphold the enforcement of the challenged legislation even though the state has not even shown that an exemption would impair its ability to *fully* achieve the societal goals of compulsory education. I emphasize that I have no quarrel with the *Yoder* Court's analysis. Rather, my quarrel is with what I believe to be Justice Boyle's mischaracterization of the *Yoder* Court's holding. See *ante,* p 501, n 25.

Contrary to Justice Boyle's assertions, the standard of review I would apply would not require the state to prove that "granting [an] exemption would effectively destroy the government's ability to achieve its purpose." *Ante,* p 506. Nor have I intended to imply that "the claim of religious practice as well as the burden thereon is defined by the claimant and that scrutiny of the claim is perhaps beyond the competence of the judiciary." *Id.* Whether a plaintiff's objection to a regulation is based upon sincerely held religious beliefs is, of course, a factual question and, as such, is reviewable accordingly. If that question is determined in the negative, the court need not proceed to determining whether the state has established its burden to justify the enforcement of that regulation, as applied, because no bona fide religious objection had been established.

In the present case, Justice Boyle seems to determine "that compliance with the state teacher certification program will [not] endanger or restrict the free exercise of [plaintiffs'] religious beliefs" (*ante,* p 508), although she does not expressly reverse the trial court's contrary factual determination. Nevertheless, she then proceeds to apply the "strict scrutiny" standard of review. See *ante,* pp 498-499, n 21. In applying that standard of review, however, she shifts the state's burden to

justify the necessity of enforcing the challenged
regulation upon plaintiffs to establish that its
enforcement is unnecessary. The ultimate result is
to avoid applying any degree of heightened scru-
tiny to the legislation in question and, instead, to
uphold it, applying "closer scrutiny [to] plaintiffs'
claims," *ante,* p 511, because "logic . . . indicate[s]
that it furthers [the goals of compulsory educa-
tion]." *Ante,* p 513.

Justice BOYLE's analysis exemplifies the inappro-
priateness of the "balancing test" she asserts in
construing the individual rights and concomitant
limitations upon governmental authority embodied
in the First and Fourteenth Amendments. While
the methodology expressed concerning the applica-
ble factors in applying that "balancing test" (*ante,*
pp 505-508) is sociologically interesting, such a
discretionary nondefinitional standard provides no
guidance to the judiciary in deciding free exercise
cases and no ascertainable standard of appellate
review. The constitutional principles consistently
applied in the controlling decisions of the United
States Supreme Court, to be sure, have resulted in
striking a necessary balance between the rights of .
the individual and the interests of government.
That balance, however, is a necessary end and not
a means to avoid enforcing the limitations upon
majoritarian authority inherently required to safe-
guard the fundamental individual rights which, by
our form of government, have been withheld from
governmental restriction. It is beyond question
that the state must justify restricting First
Amendment rights; the individual need not justify
nonrestriction.

C

Chief Justice WILLIAMS and Justice BOYLE would

uphold the enforcement of the teacher certification requirement as applied to plaintiffs (bona fide religious objectors) without adequately considering the fundamental individual rights at issue or the effect that accommodating plaintiffs' free exercise of those rights would have upon the achievement of the governmental interest involved. They reach their decision in this case, not by finding that enforcing the certification requirement is essential to the state's interest in education, but by dismissing plaintiffs' religious beliefs and practices as unimportant and characterizing the burdening of plaintiffs' free exercise of those beliefs as "minimal." Their insensitivity in this regard does not comport with this Court's constitutionally mandated responsibility to safeguard the individual freedoms guaranteed by the First and Fourteenth Amendments, and to enforce the limitations upon governmental authority commensurate therewith.

VII

Plaintiffs also contend that the intrusive and broadly expressed continuous regulatory authority over the existence and operation of their religious schools imposed by the private and parochial schools act of 1921 violates the Establishment Clause. Having expressly adopted the limiting constructions of the curriculum, licensing, supervision, and enforcement provisions of the act, discussed in part III, I would be persuaded that the teacher certification requirement alone would not create the excessive entanglement that the constitution forbids. I would emphasize, however, that my conclusion in this regard would be premised upon the limiting constructions adopted.

I would note that plaintiffs' independent fundamentalist Christian schools are pervasively religious institutions, and that the burden imposed upon them by the state teacher certification requirement is substantial, because the criteria applied by plaintiffs in hiring faculty is necessarily religious. The regulation of plaintiffs' teacher employment practices as an integral aspect of their church-teacher employment relationship, therefore, necessarily implicates religious concerns. See *Tilton v Richardson,* 403 US 672; 91 S Ct 2091; 29 L Ed 2d 790 (1971); *Lemon v Kurtzman,* 403 US 602; 91 S Ct 2105; 29 L Ed 2d 745 (1971). Intrusions into the teaching function of religious schools may cause excessive entanglement. *New York v Cathedral Academy,* 434 US 125; 98 S Ct 340; 54 L Ed 2d 346 (1977); *Meek v Pittenger,* 421 US 349; 95 S Ct 1753; 44 L Ed 2d 217 (1975); *Catholic Bishop, supra.* See also *Dayton Christian Schools v Ohio Civil Rights Comm,* 766 F2d 932 (CA 6, 1985); *NLRB v Bishop Ford Central Catholic High School,* 623 F2d 818 (CA 2, 1980).

Nevertheless, I would be unable to conclude that the teacher certification employment regulation alone results in creating excessive church-state entanglement to an extent violative of the Establishment Clause.

VIII

In summary, I would resolve several of the constitutional issues originally adjudicated on nonconstitutional grounds by expressly adopting a limiting construction of the curriculum, licensing, and supervision provisions of the act, and reverse

the decision of the Court of Appeals to the extent that it is inconsistent with the limiting constructions adopted.

Further, I would reverse the decision of the Court of Appeals with regard to plaintiffs' free exercise challenge to the enforcement of the teacher certification regulation and reinstate the trial court's decision enjoining the enforcement of that statutory requirement as applied. The enforcement of the teacher certification statute, which would allow closing down plaintiffs' schools and compelling the children attending those schools to attend the public schools or an "approved" nonpublic school against the wishes of the children's parents, would be violative of the First Amendment's Free Exercise Clause. The state has not established, to the extent required by the constitution, the necessity of overriding plaintiffs' First Amendment rights; establishing that the teacher certification regulation is *rationally related* to the governmental interest in compulsory education, however strong that interest may be, is insufficient. Until the state can show otherwise, plaintiffs, who have established a bona fide religious conflict to compliance with that statutory regulation, are constitutionally entitled to exemption.

Finally, I would hold that the teacher certification provision of the act does not violate the Establishment Clause.

LEVIN and CAVANAGH, JJ., concurred with RILEY, J.

ARCHER, J., took no part in the decision of this case.